UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

USPA ACCESSORIES LLC d/b/a
CONCEPT ONE,                                        :

                  Plaintiff,                    :            08 Civ. 2155 (RJS)
                                                   ECF CASE

    -against-                                      :

MAINLAND HEADWEAR HOLDINGS         :            <u>ANSWER</u>
LTD.,
                                            :

                  Defendant.                    :

_____X

      Defendant Mainland Headwear Holdings, Ltd. ("Mainland"), by its attorneys

Wormser, Kiely, Galef & Jacobs LLP and Bell Boyd & Lloyd LLP, for its Answer to the

Complaint of USPA Accessories LLC d/b/a Concept One ("Concept One" or "Plaintiff"):

      1.      Admits, upon information and belief, the allegations contained in

Paragraph 1 of the Complaint, except denies knowledge or information sufficient to form

a belief as to the truth or falsity of the allegations concerning the office address of

Concept One.

      2.      Admits, upon information and belief, the allegations contained in

Paragraph 2 of the Complaint.

      3.      Admits the allegations contained in Paragraph 3 of the Complaint.

<u>JURISDICTION AND VENUE</u>

      4.      Admits it is a citizen of a foreign State; admits, upon information and

belief, that Plaintiff is a citizen of a State; admits that Plaintiff alleges that the matter in

controversy exceeds $75,000; and avers that the question whether the Court has jurisdiction pursuant to 28 U.S.C. 1332(a) is a question of law.

5.    Denies the allegations contained in Paragraph 5 of the Complaint, except admits that it assented and submitted to the personal jurisdiction and venue of this Court pursuant to the Manufacturing Agreement annexed to the Complaint as Exhibit A.

<u>THE AGREEMENT</u>

6.    Admits the allegations contained in Paragraph 6 of the Complaint, except avers that Drew Pearson Marketing, LLC (DPM LLC"), a New York limited liability company, was also a party to the Manufacturing Agreement, and further avers that on or about December 11, 2006, DPM LLC, Mainland, Great Champion International Co., Ltd. ("Great Champion"), Drew Pearson Marketing Inc. ("DPM Inc.") and Plaintiff entered into an Asset Purchase Agreement ("APA") pursuant to which, among other things: Great Champion sold substantially all of the assets of DPM Inc. to DPM LLC; DPM LLC assumed certain of the liabilities of DPM Inc.; and Concept One guaranteed the full and timely performance of DPM LLC's obligations under both the APA and the Manufacturing Agreement.  The Manufacturing Agreement and the APA are integral to one another, and they both provide consideration to Mainland for entering into the Manufacturing Agreement.

A copy of the APA and a separate Guaranty, concurrently executed by Concept One ("Guaranty"), are annexed collectively hereto as Exhibit 1.  Concept One and DPM LLC are, from time to time, referred to collectively as "Buyers".

7.    Admits the allegations in Paragraph 7 of the Complaint, and avers that Section 8 of the Manufacturing Agreement -- "Buyers' Minimum Purchase

Commitment" – provides, among other things, that DPM LLC and Concept One will purchase at least a specified minimum amount of "Products" from Mainland in seven (7) "Annual Periods", the last of which extends from May 1, 2013 through April 30, 2014.

8.      Denies the allegations contained in Paragraph 8 of the Complaint, and refers to the Manufacturing Agreement, the APA, and the Guaranty for their complete terms and conditions.

9.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 9 of the Complaint.

A.  Quality and Performance

10.      Denies the allegations contained in Paragraph 10 of the Complaint, except avers that Paragraph 10 asserts a legal conclusion with respect to which no responsive pleading is required, and refers to the Manufacturing Agreement, the APA and the Guaranty for the complete terms and conditions of the transactions among the parties.

11.      Admits that Paragraph 11 of the Complaint accurately quotes a limited portion of Section 9(a) of the Manufacturing Agreement, refers to Section 9(a) of the Manufacturing Agreement for its complete terms and conditions, and avers that Section 9(a) specifies, among other things, that the "Buyers" (defined in the Manufacturing Agreement as Concept One, DPM LLC, East Asia, Ltd., and any other affiliate of Concept One that may place orders for Products) are required to provide a formal written notice pursuant to Section 13 of the Manufacturing Agreement and Section 9.8 of the APA in the event that goods shipped were non-conforming.

12.      Admits that Paragraph 12 of the Complaint accurately quotes limited portions of Sections 9(b) and 4(a) of the Manufacturing Agreement, and purports to

paraphrase Sections 4(a) and 9(b) of such agreement, but avers that, in accordance with Section 4(a) of the Manufacturing Agreement, Buyers are afforded the right -- "from time to time" -- to provide artwork and/or reference samples to Mainland from which Mainland shall produce "Development Samples" as a prelude to DPM LLC or Concept One placing Purchase Orders with Mainland, and refers to Sections 4(a) and 9(b) of such Agreement for their complete terms and conditions.

13.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of the Complaint, except admits that Paragraph 13 accurately quotes a limited portion of Section 9(b) of the Manufacturing Agreement, and refers to Section 9(b) of the Manufacturing Agreement for its complete terms and conditions.

14.     Denies the allegations contained in Paragraph 14 of the Complaint, and refers to Section 4 of the Manufacturing Agreement for the process pursuant to which purchases are to be affected under the Manufacturing Agreement.

15.     Denies the allegations contained in Paragraph 15 of the Complaint, except admits those allegations to the extent they refer to Purchase Orders that have been "accepted" by Mainland in accordance with Section 4 of the Manufacturing Agreement.

16.     Denies the allegations contained in Paragraph 16 of the Complaint, except admits that Section 5 of the Manufacturing Agreement provides that, for each Purchase Order accepted by Mainland, Mainland will "deliver the Products to Buyers according to the "Ship By Date" specified in the Purchase Order", and avers that, while Section 9(c) of the Manufacturing Agreement contains the language quoted in Paragraph 16 of the

Complaint, Section 9(c) also provides that Mainland "will use its best efforts to deliver all confirmed orders on the dates set forth on the Purchase Orders."

17.    Admits that Paragraph 17 of the Complaint correctly quotes part of Section 9(d) of the Manufacturing Agreement, refers to Section 9(d) of the Manufacturing Agreement for its complete terms and conditions, and avers that Section 9(d) of the Manufacturing Agreement provides that, in the event the Buyers receive "defective Products", Mainland's obligation is to replace or allow Buyers credit up to the invoiced amount.

18.    Admits that Paragraph 18 of the Complaint correctly quotes a limited portion of Section 9(d) of the Manufacturing Agreement, refers to Section 9(d) of the Manufacturing Agreement for its complete terms and conditions, and avers that Section 9(d) of the Manufacturing Agreement also provides that, in the event Buyers receive "defective Products",  Mainland's obligation is to replace or allow Buyers credit up to the invoiced amount.

19.    Admits that Paragraph 19 of the Complaint quotes a limited portion of Section 9(d) of the Manufacturing Agreement and refers to Section 9(d) of the Manufacturing Agreement for its complete terms and conditions.

20.    Denies the allegations contained in Paragraph 20 of the Complaint, and refers to the Manufacturing Agreement for the complete terms and conditions of Mainland's obligations to the Buyers.

B.  The Dedicated Facility

21.     Denies the allegations contained in Paragraph 21 of the Complaint, and refers to Section 12 of the Manufacturing Agreement for the parties' obligations with respect to a temporary or permanent "separate manufacturing facility."

22.     Admits that Paragraph 22 of the Complaint purports to paraphrase certain privacy and exclusivity criteria, and refers to Section 12 of the Manufacturing Agreement and Exhibit B thereto for the complete terms and conditions of such Agreement with regard to the separate manufacturing facility.

23.     Admits the allegations contained in Paragraph 23 of the Complaint to the extent that, prior to executing the Manufacturing Agreement, the parties discussed constructing a separate manufacturing facility dedicated to the manufacture of Products for Concept One and DPM LLC in Panyu, Peoples Republic of China; and that Mainland was unable to obtain the required building permits for the Panyu facility from the Chinese authorities prior to the execution of the Manufacturing Agreement; and avers that, as a consequence, the parties agreed upon certain of the provisions set forth in Section 12 of the Manufacturing Agreement -- which Section, among other things, eliminated the exclusive use by the Buyers of a Dedicated Facility and a so-called Interim Dedicated Facility in the event "the [Buyers] purchase orders for any trailing three month period [were] less than 70% of the monthly average of the minimum purchase amount (Minimum Purchase Amount/12) set forth in Section 8(a)(ii) . …"

24.     Denies the allegations contained in Paragraph 24 of the Complaint, except admits that, pursuant to Section 12(a) of the Manufacturing Agreement, Mainland agreed

to build an Interim Dedicated Facility adjacent to Mainland's existing facility in Shenzhen in accordance with Section 12(a) of such Agreement.

25.     Admits the allegations contained in Paragraph 25 of the Complaint to the extent that, according to Section 12(a) of the Manufacturing Agreement, Buyers agreed to use the Interim Dedicated Facility on the condition that it be operated in accordance with the privacy and production exclusivity criteria "to be maintained for the permanent dedicated facility" as set forth in Exhibit B to the Manufacturing Agreement.

26.     Admits that Paragraph 26 of the Complaint purports to paraphrase Section 12(a) of the Manufacturing Agreement, but avers that Plaintiff has no right to terminate the Agreement.

C.  Labor and Human Rights Standards

27.     Admits that Paragraph 27 of the Complaint purports to paraphrase a limited portion of Section 12(d) of the Manufacturing Agreement, and refers to Section 12(d) for its complete terms and conditions.

28.     Admits that Paragraph 28 of the Complaint purports to paraphrase a limited portion of Section 12(d) of the Manufacturing Agreement, and refers to Section 12(d) for its complete terms and conditions.

29.     Admits that Paragraph 29 of the Complaint quotes a limited portion of Section 12(d) of the Manufacturing Agreement, and refers to Section 12(d) for its complete terms and conditions.

30.     Admits that Paragraph 30 of the Complaint purports to paraphrase a portion of Section 12(c) of the Manufacturing Agreement, and refers to Section 12(c) for its complete terms and conditions.

D.     The Pricing Structure

31.     Admits that Paragraph 31 purports to paraphrase a portion of Section 6(a) of the Manufacturing Agreement, and refers to Section 6(a) for its complete terms and conditions.

THE BREACHES

32.     Denies the allegations contained in Paragraph 32 of the Complaint.

A .   Quality and Performance Standards

33.     Denies the allegations contained in Paragraph 33 of the Complaint.

34.     Denies the allegations contained in Paragraph 34 of the Complaint, except denies knowledge or information sufficient to form a belief as to truth or falsity of the allegation that Plaintiff sought to procure samples from two separate vendors.

35.     Denies the allegations contained in Paragraph 35 of the Complaint.

36.     Denies the allegations contained in Paragraph 36 of the Complaint, except denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Plaintiff's success or failure with respect to specific selling programs.

37.     Denies the allegations contained in Paragraph 37 of the Complaint.

38.     Denies the allegations contained in Paragraph 38 of the Complaint, except denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning complaints received by Plaintiff from its customers and Plaintiff's alleged good will with its customers, and avers that Buyers accepted the Products shipped to them by Mainland and did not provide "notice" in accordance with Section 13 of the

39.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 39 of the Complaint, and avers that the Buyers accepted Products shipped to them by Mainland and did not provide "notice" in accordance with Section 13 of the Manufacturing Agreement or Section 9.8 of the APA that Products shipped to them were non-conforming.

40.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 40 of the Complaint, except avers that, in accordance with Section 12(b) of the Manufacturing Agreement, Mainland was permitted to subcontract the manufacturer of knitted headwear without prior consent of the Buyers.

41.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 41 of the Complaint, except avers that, in accordance with Section 12(b) of the Manufacturing Agreement, Mainland was permitted to sub-contract knitted headwear without the prior consent of the Buyers.

42.     Denies the allegations contained in Paragraph 42 of the Complaint.

B.  The Dedicated Facility

43.     Denies the allegations contained in Paragraph 43 of the Complaint that Mainland did not commence the building of the Interim Dedicated Facility, and avers that construction commenced in May 2007.

C.     Labor and Human Rights Standards

44.     Denies the allegations contained in Paragraph 44 of the Complaint, and avers that it was falsely alleged to have engaged in certain practices which affected its factories' ability to become qualified by certain of Plaintiff's licensors or customers.

45.     Denies the allegations contained in Paragraph 45 of the Complaint, except admits that at some time after Sears acquired K-Mart, K-Mart removed a Mainland-owned factory as an "approved" factory for one year from May 3, 2007, avers that the quantity of Products previously manufactured by Mainland for K-Mart was minimal, and avers that while Mainland was not initially approved for production of Levi's products, it is currently approved.

46.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 46 of the Complaint.

47.     Denies the allegations contained in Paragraph 47 of the Complaint, and avers that, on September 14, 2007, the President and CEO of Fair Labor Association ("FLA") wrote a letter advising that, despite misimpressions created by stories in the media, it conducted a review of Mainland's factory operations following alleged complaints in June 2007 about Mainland and that FLA found no issues with respect to child labor or other human rights violations, and that Mainland agreed to reduce the amount of overtime worked by employees.  A copy of the letter is annexed hereto as Exhibit 2.

48.     Denies the allegations contained in Paragraph 48 of the Complaint, and avers that, following a June 11, 2007 Wall Street Journal article about Mainland and other factories alleging concerns about child labor, paying less than minimum wage,

forcing overtime, penalizing staff who resign, and coaching workers on how to reply to outside auditors, several investigations were conducted, all of which resulted in findings favorable to Mainland.  Fair Labor Association published its findings in the September 14, 2007 letter referenced in Paragraph 47 above; the Beijing Olympic Committee restored Mainland's "full production rights"; and the Shenzhen Labor Authority issued a report (August 17, 2007) which found that the allegations in the purported June 2007 complaint were largely unsubstantiated.

49.     Denies the allegations contained in paragraph 49 of the Complaint.

50.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 50 of the Complaint, and avers that Plaintiff's reference to the unspecified "findings made against" Mainland may be based on nothing more than the false or misleading accusations referenced in Paragraphs 47 through 49 of the Complaint.  In fact, on July 27, 2007, Sam Hafif (President of Concept One) notified Vandana Balachandar of the National Basketball Association by email that, of the issues raised in a Wall Street Journal article dated June 11, 2007, the only issue potentially relevant to Mainland concerned overtime put in by its factory workers.  Based on an ITS audit conducted by Concept One, Hafif went on to advise "[o]verall, there is no difference between this factory and all of our other approved factories, actually they are better than most I've seen."

D.  The Pricing Structure

51.     Denies the allegations contained in Paragraph 51 of the Complaint.

AS AND FOR A FIRST CLAIM

52.     In response to Paragraph 52 of the Complaint, Mainland repeats and realleges its responses to Paragraphs 1 through 51 of the Complaint as if fully set forth hereat.

53.     Admits the allegations contained in Paragraph 53 of the Complaint.

54.     Denies the allegations contained in Paragraph 54 of the Complaint.

55.     Denies the allegations contained in Paragraph 55 of the Complaint.

56.     Denies the allegations contained in Paragraph 56 of the Complaint.

AS AND FOR A SECOND CLAIM

57.     In response to Paragraph 57 of the Complaint, Mainland repeats and realleges its responses to Paragraph 1 through 56 of the Complaint as if fully set forth hereat.

58.     Denies the allegations contained in Paragraph 58 of the Complaint except admits that an actual controversy and dispute exists with respect to the Manufacturing Agreement and the APA, and admits that Plaintiff purported to terminate the Manufacturing Agreement without grounds therefor.

59.     Denies the allegations contained in Paragraph 59 of the Complaint.

60.     Denies the allegations contained in Paragraph 60 of the Complaint.

FIRST ADDITIONAL DEFENSE

61.     The Complaint fails to state a Cause of Action.

SECOND ADDITIONAL DEFENSE

62.     Concept One's claims are barred under the doctrines of waiver and/or estoppel.

## THIRD ADDITIONAL DEFENSE

63.     From the time their payment obligations first became due, Buyers continuously and consistently breached the Manufacturing Agreement.

On November 2, 2007, Mainland faxed formal written notice pursuant to Section 7 of the Manufacturing Agreement advising Buyers of breaches of their payment obligations under such Agreement and demanding that all accounts be brought current within 30 days (i.e., on before December 2, 2007).  As of November 2, 2007, a "past due balance in excess of $4.0 million" existed.

By December 3, 2007, balances in excess of $3.9 million remained.  Thus, on December 5, 2007, and as a result of Buyers' substantial and continuing status of arrears, Mainland faxed a written notice (i) apprising that Mainland had reasonable grounds for insecurity as to Buyers' continued due performance under the Manufacturing Agreement, (ii) demanding that Buyers perform their obligations under the Manufacturing Agreement, and (iii) suspended performance under Section 7 of the Manufacturing Agreement and the New York Uniform Commercial Code pending receipt of such adequate assurances.

As of January 16, 2008, Buyers had an aggregate past due amount of approximately $1.7 Million and had offered no assurances that, if Mainland were to resume performance, they would comply with the terms of the Manufacturing Agreement.

Concept One's and DPM LLC's material breaches of the Manufacturing Agreement, including but not limited to their continuing failure to comply with payment terms, excused Mainland's performance under the Manufacturing Agreement.

FOURTH ADDITIONAL DEFENSE

64.    Concept One and DPM LLC failed to order Products in the quantities specified in Section 8 of the Manufacturing Agreement and as guaranteed in the APA, despite the fact that Mainland had the production capability to manufacture Products in the volumes specified in Section 8.

In fact, during the "First Annual Period" (May 1, 2007 through April 30, 2008) Buyers purchased approximately $4.6 Million worth of Products (some of which they are yet to pay for), despite the requirement in Section 8(a) of the Manufacturing Agreement that they purchase at a minimum $20 Million worth of Products or 65% of their world-wide purchases of Products within Mainland's production capability, whichever amount is lower.

Upon information and belief, Concept One and DPM LLC ordered Products from many factories in China other than Mainland, including Products within Mainland's production capability.

Concept One's and DPM LLC's failure to comply with the Manufacturing Agreement's minimum purchase obligations under Section 8 of the Manufacturing Agreement excused Mainland's further performance thereunder.

FIFTH ADDITIONAL DEFENSE

65.    Section 9(a) of the Manufacturing Agreement affords Concept One and DPM LLC the remedy of renegotiating the minimum purchase requirements set forth in Section 8 of such Agreement and effecting an "equitable adjustment," in the events that (i) Mainland "consistently and continuously" fails to comply with Section 9 of the Manufacturing Agreement or other provisions of the Agreements, (ii) such "consistent

and continuous" breach "has a material and adverse effect" on the business of Concept

One and DPM LLC, provided that (iii) Mainland has received written notice of such

breach or breaches (in accordance with Section 13 of the Manufacturing Agreement and

Section 9.8 of the APA), and (iv) the breach or breaches so noticed are not cured within

three months of such written notice.

Concept One demanded a renegotiation of the minimum purchase

requirements in a writing sent on October 29, 2007 despite the facts that (i) Mainland did

not "consistently or continuously" breach the Manufacturing Agreement, and (ii) the

"notice" received from Concept One (a) failed to specify the breaches about which

Concept One complained and (b) failed to provide Mainland with the contractually

required three month cure period.

Concept One and DPM LLC failed to comply with the Manufacturing

Agreement's notice and opportunity to cure provisions as conditions precedent to an

equitable adjustment of their minimum purchase requirements.

<u>SIXTH ADDITIONAL DEFENSE</u>

66.    Concept One and DPM LLC anticipatorily repudiated the Manufacturing

Agreement, through conduct including but not limited to their:  (a) material and

continuous failure to comply with the Manufacturing Agreement's payment and

minimum purchase provisions; (b) improper demands to renegotiate the Manufacturing

Agreement's minimum purchase requirements; (c) stated intentions not to place orders;

(d) failure to provide adequate assurances of due performance upon notice that reasonable

grounds for Mainland's insecurity existed; and (e) stated intention to improperly

terminate the Manufacturing Agreement.  Concept One's and DPM LLC's anticipatory

repudiation of the Manufacturing Agreement permitted Mainland to suspend its performance, thereby excusing Mainland's continued performance under the Manufacturing Agreement.

### SEVENTH ADDITIONAL DEFENSE

67.    Concept One and DPM LLC failed to exercise good faith and fair dealing and/or commercial reasonableness in requesting Development Samples pursuant to the Manufacturing Agreement.  Such unreasonable demands constituted a material breach of the Manufacturing Agreement, thereby excusing Mainland's performance, and, upon information and belief, such unreasonable demands were a pretextual attempt by Concept One and DPM LLC to induce a breach on the part of Mainland so that Concept One and DPM LLC could improperly manufacture a basis for terminating the Manufacturing Agreement.

### EIGHTH ADDITIONAL DEFENSE

68.    Mainland's obligation – if any – to build an Interim Dedicated Facility by December 29, 2007 – or any time thereafter – was excused by the breaches of the Manufacturing Agreement and the APA by Concept One and DPM LLC, which breaches included but were not limited to (i) failing to make timely payment for Products shipped and accepted, (ii) failing to provide adequate assurances of performance, and (iii) failing to place orders in quantities sufficient to merit an exclusive facility as provided for in Section 12(a) of the Manufacturing Agreement.

### NINTH ADDITIONAL DEFENSE

69.    Concept One's alleged damages are barred and/or should be reduced to the extent Concept One failed to mitigate its damages.

16

## TENTH ADDITIONAL DEFENSE

70.    The claims that Mainland violated labor and human rights standards were demonstrated to be false following investigations in 2007 by, or on behalf, of Fair Labor Association, the Chinese Province of Shenzhen, and the Beijing Olympic Committee.

In fact, on July 27, 2007, Sam Hafif (President of Concept One) notified Vandana Balachandar of the National Basketball Association by email that, of the issues raised in a Wall Street Journal article dated June 11, 2007, the only issue relevant to Mainland concerned overtime put in by its factory workers.  Based on an ITS audit conducted by Concept One, Hafif went on to advise Balachandar that "[o]verall, there is no difference between this factory and all of our other approved factories, actually they are better than most I've seen."

Concept One is, therefore, estopped from asserting claims with respect to alleged labor and human rights standards.

## ELEVENTH ADDITIONAL DEFENSE

71.    Concept One's claims with respect to Mainland's inability to produce certain knitwear (such as found in Paragraphs 40-41 of the Complaint) are barred pursuant to the Manufacturing Agreement, which expressly permitted Mainland to subcontract such work without the prior consent of Concept One or DPM LLC.

## TWELFTH ADDITIONAL DEFENSE

72.    Concept One's and DPM LLC's complaints about price affected product styles that are not governed by the Manufacturing Agreement.

THIRTEENTH ADDITIONAL DEFENSE

73.     Concept One and DPM LLC accepted the Products shipped to them by Mainland and did not provide adequate notice that any such Products were non-conforming.

FOURTEENTH ADDITIONAL DEFENSE

74.     The law of the Province in which Mainland operated permitted 60 hours of overtime per month whereas the County law permitted only 36 hours, subject to a waiver. Mainland had applied for and received the waiver in years prior to 2007 and was unaware of any change in the eligibility or issuance of such a waiver.

FIFTEENTH ADDITIONAL DEFENSE

75.     Concept One's claims of breach are not material.

COUNTERCLAIM

76.     Mainland has claims against Buyers, Concept One and DPM LLC that arise out of the transaction that is the subject matter of the Complaint to which this Answer responds.

77.     Mainland has, however, previously set forth such claims in a Complaint currently before this Court, i.e., Mainland Headwear Holdings, Ltd. v. Drew Pearson Marketing, LLC and USPA Accessories LLC d/b/a Concept One, 08 CV 02363 (RJS). For this reason, no separate Counterclaim will be asserted herein.

WHEREFORE, Mainland Headwear Holdings, Ltd. demands that the Complaint be dismissed in its entirety with attorneys' fees and costs awarded to it along with such other and further relief as this Court may deem just and proper.

Dated:  May 16, 2008

Respectfully submitted,

WORMSER, KIELY, GALEF & JACOBS LLP


By:_____/s/_____
         John T. Morin (JM 0390)
         Jennifer Marlborough (JM 4303)
         Attorney for Defendants
         825 Third Avenue
         New York, New York 10022
         (212) 687-4900

Of Counsel

Bell Boyd & Lloyd LLP
70 West Madison Street – Suite 3100
Chicago, IL 60602
(312) 372-1121

# EXHIBIT 1, PART I

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into this 11th day of December, 2006, by and among DREW PEARSON MARKETING, LLC, a limited liability company with an office and place of business at 1199 Excelsior Boulevard, Hopkins, MN (the "Buyer"), MAINLAND HEADWEAR HOLDINGS, LTD., a Bermuda company ("MH"), GREAT CHAMPION INTERNATIONAL CO., LTD., a British Virgin Islands company that is wholly owned by MH ("Great Champion"), DREW PEARSON MARKETING, INC., a Minnesota corporation (the "Company" or the "Seller"), and U.S.P.A ACCESSORIES, LLC D/B/A CONCEPT ONE, a New York limited liability company ("CO"). Buyer, CO, Great Champion, MH and the Company are hereinafter referred to collectively as the "Parties" and each singularly as a "Party."

### RECITALS

WHEREAS, Great Champion, a wholly owned subsidiary of MH, is the legal and beneficial owner of all right, title and interest in and to all of the issued and outstanding shares of capital stock of the Company;

WHEREAS, the Company is engaged in the business of designing, importing, selling, distributing and promoting caps, hats, accessories and various related products (the "Business"); and

WHEREAS, the Parties desire that the Company sell to the Buyer all of its assets, except for certain excluded tax assets that are more fully described herein, which constitute substantially all of the assets necessary to conduct the Business, and that the Buyer assume all of the liabilities of the Company, except for certain excluded tax liabilities that are more fully described herein, upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration (the receipt, adequacy and sufficiency of which are hereby acknowledged by the Parties by their execution hereof), the Parties hereby agree as follows:

### ARTICLE I - PURCHASE AND SALE OF ASSETS

1.1     The Transaction. Upon the terms and subject to the conditions of this Agreement, at Closing (as defined in Section 3.1 below), the Company shall sell, transfer, assign and deliver to the Buyer, and the Buyer shall acquire free and clear of all Liens, all of the Company's right, title and interest in and to all of its assets of any kind and nature, wherever located (the "Assets"), except for the Excluded Assets (as defined in Section 1.2), including but not limited to the following:

(a)     all of the Company's inventories of finished goods, wherever located, including goods in transit or overseas ("Inventories"), including but not limited the Inventories of the Company listed on Schedule 4.11;

(b)     all cash and cash equivalents of the Company, all Company accounts and notes receivables of any kind, and any and all other amounts due to the Company from whatever source ("Receivables"), including but not limited to the cash, cash equivalents and

1

Receivables that are listed on Schedule 4.10 (which cash and cash equivalents consist of the balances of the Company's bank accounts, and shall be remitted to the Buyer at Closing by delivery of a good check in the amount of the balances available as of the Closing Date), the right to receive from the United States Internal Revenue Service ("IRS") an income tax refund in the amount of $316,052 shown to be due to the Company on a previously filed Return with respect to the 2005 fiscal year (the "2005 Tax Refund"), which shall be remitted by the Company to the Buyer in accordance with the procedure set forth in Section 1.4 (a) below, and the right to receive any income tax refund that may be due by the IRS and/or any state or local authority to the Company with respect to the 2006 fiscal year (a "2006 Tax Refund"), which shall be determined and (if applicable) remitted to the Buyer in accordance with the procedures set forth in Section 1.4(b) below;

(c) (i) all copyrights, designs, trademarks, service marks, franchises, service names, trade names, and assumed names, patents, and all registrations and applications therefor which the Company owns or has rights to; and (ii) all licenses and other agreements relating to any and all trademarks, service marks, franchises, service names, trade names, and assumed names, designs, drawings, patterns, specifications, patents, copyrights, and all registrations and applications therefor which the Company owns or has rights to (collectively, the "Intellectual Property"), which Intellectual Property is listed on Schedule 4.14 and Schedule 4.15;

(d) all vendor numbers, trade secrets, know-how, and other intangible property other than the Intellectual Property owned or used by the Company;

(e) all contracts, understandings, commitments, arrangements, orders, instruments, and other arrangements, whether oral or written ("Contracts"), other than the license agreements for Intellectual Property referenced in subparagraph (c) above, including but not limited to Contracts with customers, contractors, suppliers, insurers, employees, and affiliates, which Contracts are listed on Schedule 4.15.

(f) all furniture, fixtures, equipment, tools, machinery, computer parts, office supplies, maintenance supplies, and other supplies and hardware, that are listed on Schedule 4.13;

(g) the goodwill of the Business;

(h) copies of all books, records, correspondence, production records, employment records, customer relation information, and any other materials, document or information related to the Company;

(i) all sales, advertising and promotional material and literature, catalogs and manuals; and

(j) any and all other assets used in connection with the Business.

1.2 Excluded Assets. The Assets shall not include, and the Buyer hereby acquires no right to, (i) the tax deferred assets in the approximate amount of $731,000 that are referenced in the Financial Statements (the "Excluded Tax Assets"), (ii) the Contracts set forth on Schedule 1.2 (the "Excluded

2

Contracts"), and (iii) the loan receivable in the amount of $38,014 due to the Company by Mr. Marc D'Amelio, a Company employee (the "Excluded Receivable").

1.3    Assumption of Liabilities.    At Closing the Buyer shall assume any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by the Company of any type, whether accrued, absolute, contingent, matured, unmatured or other (collectively, the "Liabilities"), except for any and all Taxes (as defined in Section 4.20(a)), and for any unaccrued or unreported Tax liabilities with respect to the Company, for all periods prior to or including the Closing Date (the "Excluded Tax Liabilities"), and except for any Liabilities arising in connection with the Excluded Contracts that are not disclosed in the Financial Statements. The Parties acknowledge and agree that the Buyer is not assuming any liability of the Company for income taxes with respect to fiscal year 2006, and that the Buyer's agreement to reimburse the Company for such liability after payment thereof, upon the terms and subject to the conditions of Section 1.4(b), shall not be deemed to give any tax authority or other party the right to collect such tax liability directly from the Buyer.

1.4    2005 and 2006 Tax Refunds and Liabilities.    (a)  MH shall cause the Company to, and the Company shall, remit to the Buyer, immediately upon receipt from the IRS, the entire amount of the 2005 Tax Refund. MH and the Company shall take all steps necessary to insure that their accountants or other representatives in the United States collect and deposit the check expected to be received from the IRS with respect to the 2005 Tax Refund, and they shall give prompt written notice to the Buyer of the receipt of such check. Notwithstanding anything herein to the contrary, MH and the Company shall be jointly and severally liable to pay the entire amount of the 2005 Tax Refund to the Buyer within 120 days after the Closing Date, whether or not the IRS remits such amount to the Company and regardless of whether the IRS denies all or any part of the 2005 Tax Refund . After the 2005 Tax Refund is remitted to the Buyer, the Selling Parties shall have the right to challenge the IRS determination with respect to the 2005 Tax Refund, and if they prevail to retain any additional refund or payment received from the IRS. The Parties shall collaborate and take all steps necessary to insure that the 2005 Tax Refund is received from the IRS in the normal course of business, including but not limited to by placing appropriate inquiries in the event that processing of the 2005 Tax Refund appears to be delayed.

(b)  MH and the Company shall cause their United States accountants (the "Company Accountants") to prepare and provide to the Buyer, not later than 90 days after the Closing Date, a computation of the Federal, state and local income tax liability of the Company for the 2006 fiscal year. The computation shall determine, among other ordinary items, whether any 2006 Tax Refund is available based on carry-back claims of any qualified losses for prior tax years. The representatives of the Buyer shall have thirty days to review the Selling Parties' computation and give written notice of any objections thereto to the Company. If the Parties and their representatives are unable in good faith to resolve a disagreement with respect to the computation within thirty days after the Buyer gives notice of its objections, then the Parties shall submit the dispute to an Independent Accountant who shall be designated in the manner provided in Section 2.3 below. The Parties shall use their best efforts to cause the Independent Accountant to render a decision within 60 days after the expiration of the 30 day period during which the parties are to seek to resolve their dispute in good faith or, if impossible, as soon as practicable after the expiration of such 60 day period. After the Company's 2006 tax liability has been determined, whether consensually or by the Independent Accountant, MH shall cause the Company to, and the Company shall, promptly file Returns consistent with the

definitive computation of the tax liability.  If a 2006 Tax Refund is due from the IRS and/or any state or local tax authority to the Company, then MH shall cause the Company to, and the Company shall, immediately upon receipt from the IRS or such other tax authority, remit the entire amount of the 2006 Tax Refund to the Buyer.  MH and the Company shall take all steps necessary to insure that their accountants or other representatives in the United States collect and deposit any check expected to be received from the IRS with respect to the 2006 Tax Refund, and they shall give prompt written notice to the Buyer of the receipt of such check.  If the Company has any Federal, state or local tax liability for the 2006 fiscal year ("2006 Tax Liability"), then, provided that the 2006 Tax Liability does not exceed the amount included in the calculation of the NAV pursuant to Section 2.3(a) below, the Buyer shall reimburse to the Company the entire amount of the 2006 Tax Liability upon receipt of adequate evidence showing remittance of payment for the 2006 Tax Liability by the Company to the IRS or other tax authority.

1.5  Arrangement with David Briskie.  The Parties acknowledge that the Company has, in the ordinary course of business accrued unpaid gratuity payments to David Briskie on its books, and the aggregate accrued amount as of October 31, 2006 is equal to $151,000, which is reflected in the Financial Statements.  MH and the Company have agreed, as a condition to closing as provided in Section 3.4(f), that the employment agreement between the Company and David Briskie shall be terminated, and that Mr. Briskie shall provide an unconditional release of all claims as provided in Section 3.4(f).  Before Closing, provided that such condition has been satisfied, the Company shall remit to Mr. Briskie, concurrently with his execution of the release and the termination agreement referenced above, the gratuities that are accrued on the Company's books in a manner consistent with the arrangement described in this Section 1.5 as of the effective date of such release and agreement, notwithstanding anything to the contrary in Section 3.4(f).

## ARTICLE II - CONSIDERATION FOR THE ASSETS

2.1.  Purchase Price.  The initial purchase price for the Assets is Eight Million Dollars ($8,000,000) (the "Initial Purchase Price").

2.2  Payment of the Purchase Price.  The Initial Purchase Price shall be paid at the Closing by wire transfer of immediately available U.S. Dollar funds to the escrow account of the Seller's counsel.  Seller shall give to Buyer, not later than two business days prior to the Closing Date, written wire instructions for the escrow account of Seller's counsel.

2.3  Adjustment of Purchase Price.  (a)  Within 45 days after the Closing Date, the Buyer shall determine and submit to the Seller the net value of the Assets of the Business as of the Closing Date (the "NAV").  The NAV shall be calculated in accordance with GAAP (as defined in Section 4.7(a)), consistently applied.  The Parties acknowledge and agree that (i) the amount of $316,052, corresponding to the 2005 Tax Refund, shall be included as an Asset for purposes of calculating the NAV, (ii) the Excluded Tax Assets shall be included as Assets for purposes of calculating the NAV, (iii) the 2006 Tax Refund, if any, shall not be included as an Asset for purposes of calculating the NAV, (iv) the 2006 Tax Liability, if any, shall be included as a liability for purposes of calculating the NAV if it is required to be reimbursed by the Buyer to the Company as provided in Section 1.4(b) above, provided that the Parties shall estimate such 2006 Tax Liability when calculating the NAV as provided below, and (v) the Excluded Receivable shall not be included as an asset for purposes of

4

calculating the NAV. Within 30 days after the Seller's receipt of the Buyer's calculation of the NAV, the Seller may object in writing to the Buyer's determination, setting forth in reasonable detail the basis for such objection, provided that the Seller shall be deemed to have accepted the Buyer's calculation of the NAV if the Seller shall have failed to raise and give written notice to the Buyer of its objections within such 30 day period. If the Seller raises objections to the Buyer's calculation of the NAV, the parties shall attempt in good faith to resolve their dispute. If they are unable to resolve the dispute within 30 days after receipt by the Buyer of the Seller's objections, the parties shall submit the matter to a jointly selected third party accountant (the "Independent Accountant"), whose determination shall be final and binding absent fraud or manifest error. The parties shall use their best efforts to cause the Independent Accountant to render a decision within 60 days after the expiration of the 30 day period during which the parties are to seek to resolve their dispute in good faith or, if impossible, as soon as practicable after the expiration of such 60 day period. In the event of a disagreement among the Parties with respect to the designation of such Independent Accountant, he or she shall be designated by the American Arbitration Association, New York, New York, in accordance with its then applicable rules, upon request by either Buyer or Seller. After the Closing Date, Buyer shall provide Seller reasonable access, during reasonable business hours, to the personnel, properties, books and records of the Company for the purposes of this Section 2.3. The cost of any arbitration (including the reasonable fees and expenses of the Independent Accountant and reasonable attorney fees and expenses of the parties) pursuant to this Section 2.3 shall be allocated proportionately to the Parties based on the extent to which the calculation of the NAV that is asserted by each Party in the arbitration deviates from the Independent Accountants' ruling. For example, if the Seller asserts that the NAV is $6,700,000, the Buyer asserts that the NAV is $6,000,000, and the Independent Accountant rules that the NAV is $6,300,000, then the Buyer would be off by $300,000, the Seller would be off by $400,000, the Buyer and the Seller would be off collectively by $700,000, and the Buyer would be liable to pay for 3/7 of the arbitration costs and the Seller would be liable to pay for 4/7 of the arbitration costs. Each Party shall reimburse the other promptly after the Independent Accountant's decision is rendered for any cost of arbitration that might have been paid before the date of the Independent Accountant's definitive decision, so as to give effect to provisions of the previous sentence.

(b)    In the event that the NAV is less than $6,700,000 (such shortfall, the "Shortfall"), Seller shall, within ten days after the NAV is finally determined pursuant to Section 2.3(a), make payment to Buyer by wire transfer in immediately available funds of the amount of the Shortfall. If Seller fails to pay the Shortfall within such ten-day period, Buyer may offset such unpaid Shortfall against any amounts due to Seller or MH under any other agreement, including but not limited to the Transaction Documents referenced in Section 3.2(f) and the Promissory Note referenced in Section 3.3(e).

(c)    The Parties acknowledge that certain adjustments prepared by the Buyer's representative to the financial statements of the Company for the period ended August 31, 2006 have not been included in the Financial Statements, and that the inclusion of the Financial Statements as Schedule 4.7(a) shall not be construed as a waiver by any Party of its right to raise, in the course of calculating the NAV, the same or similar objections raised by such Party in relation to such adjustments.

2.4    Purchase Price Allocation.    The Parties agree to report the transactions contemplated herein, and the allocation of the Purchase Price set forth in Schedule 2.4, in all government filings (including but not limited to IRS Form 8594). The Buyer's representatives shall prepare and submit

Schedule 2.4 to the Company for its approval (not to be unreasonably withheld), within 45 days after the Closing Date.

## ARTICLE III - CLOSING

3.1  <u>Closing</u>.  The purchase and sale of the Assets (the "Closing") provided for in this Agreement will take place at the offices of Seller's counsel at 405 Lexington Avenue, New York, NY 10174 , at 10:00 a.m. (local time) on December 31, 2006, or at such other time and place as the parties may agree (the "Closing Date").

3.2  <u>Deliveries by the Selling Parties</u>.  At Closing, MH, Great Champion and the Company (collectively sometimes referred to as the "Selling Parties") shall deliver, or cause the delivery, to or for the benefit of the Buyer, concurrently herewith, of the following:

(a) <u>Bills of Sale, Assignment</u>.  Bills of Sale for the Inventories and any equipment that may be included in the Assets, assignment instruments for the Contracts and all license agreements to be transferred (in addition to the consents and license extensions referenced in subparagraph (e) below), and such instruments of conveyance for the Assets as the Buyer may reasonably request to perfect the sale, transfer, conveyance and delivery of the Assets;

(b) <u>Closing Certificate</u>.  A certificate of an authorized officer of the Seller certifying as to: (i) the accuracy of the representations and warranties set forth in Article IV; and (ii) compliance with all conditions, covenants, agreements and undertakings of the Seller to be complied with prior to the Closing Date;

(c)  <u>Resolutions</u>.  Certified copies of the resolutions of the Seller's Board of Directors evidencing the approval and authorization of the transactions contemplated hereby;

(d) <u>State Certificates</u>.  A Certificate of Good Standing of the Company from the Secretary of State of the State of Minnesota and each jurisdiction in which the Company is qualified to do business dated within thirty (30) days prior to the Closing Date;

(e) <u>Releases</u>.  Releases and termination statements, executed by the appropriate secured party and in a form appropriate for recording and filing, that are sufficient to release any and all assignments, charges, chattel mortgages, claims, conditional sales contracts, covenants, deeds of trust, encumbrances, hire purchase agreements, imperfections, legal or equitable claims of others, liens, mortgages, pledges, restrictions, restrictive agreements, security agreements, security interests, transfer restrictions, and title retention agreements of any kind and nature ("Liens"), against or relating to the Assets; and

(f) <u>Consents; License Extensions; Other Transaction Documents</u>.  All consents and extension agreements referenced in Section 4.4, a duly executed Manufacturing Agreement in the form of Exhibit 3.2(f)-A (the "Manufacturing Agreement"), , and a duly executed Option Agreement in the form of Exhibit 3.2(f)-B (the "Option Agreement", and together with this Agreement, the Guaranty referenced in Section 3.3(f), the Promissory Note referenced in Section 3.3(e), and the Manufacturing Agreement, the "Transaction Documents").

3.3    Deliveries by the Buyer.  The Buyer is delivering, or causing the delivery, to or for the benefit of the Seller, concurrently herewith, of the following:

(a)  Closing Payment.  The Initial Purchase Price set forth in Article II herein;

(b)  Closing Certificate.  A certificate of an authorized officer of the Buyer certifying as to: (i) the accuracy of the representations and warranties set forth in Article IV; and (ii) compliance with all conditions, covenants, agreements and undertakings of the Buyer to be complied with prior to the Closing;

(c)  State Certificates.  A certificate of the New York Secretary of State certifying as to the good standing of the Buyer dated within thirty (30) days prior to the Closing Date;

(d)  Assumption Instrument.  An assumption instrument evidencing the Buyer's assumption of the Liabilities; and

(d)  Transaction Documents.  Duly executed Transaction Documents.

(e)  Debt to MH.  A duly executed promissory note, in the form of Exhibit 3.3(e), evidencing the trade debt owed to MH by the Company that is being assumed by Buyer, and setting forth the repayment terms thereof (the "Promissory Note"), provided that Buyer shall have the right to offset any amount due under this Agreement to the Buyer by any of the Selling Parties against obligations to MH under the Promissory Note, and provided further that the Buyer's accountants shall have, before Closing, verified to their reasonable satisfaction that the invoiced amounts to be paid pursuant to the Promissory Note corresponds to products actually delivered.

(f)  A Guaranty by CO of the obligations of the Buyer under this Agreement and the Promissory Note referenced in Section 3.3(e) in form and substance reasonably satisfactory to the Seller (the "Guaranty")

3.4    Conditions to the Buyer's Obligation to Close.  Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)  No Legal Proceedings.  No judicial or administrative proceeding shall be pending that seeks to enjoin or prevent, nor shall any order or injunction have been issued prohibiting consummation of the transactions contemplated hereby;

(b)  Fulfillment of Obligations.  The Selling Parties shall have duly performed or complied with all of the material obligations to be performed or complied with by them under the terms of this Agreement;

(c)  Accuracy of Representations and Warranties.  The representations and warranties of the Selling Parties set forth in Article IV hereof, and the covenant and warranty set forth in Section 6.10, shall be true and correct in all material respects as of the date hereof and as of the Closing Date;

(d)  Approvals and Notices.  All approvals and notices required with respect to the

transactions contemplated by this Agreement shall have been obtained or met;

(e) Closing Deliveries. The Selling Parties shall have delivered all of the items listed in Section 3.2; and

(f) Transaction Documents, Consents and Lease Extensions; Termination and Release of David Briskie's Employment Agreement. All of the Transaction Documents, consents and lease extensions referenced in Section 3.2(f) and Section 4.4 shall have been obtained and delivered to the Buyer, and a release of and settlement of any claims due under any employment agreement between the Company and David Briskie, which release and settlement shall inure to the benefit of the Company, MH their successors and assigns, and such parties' respective affiliates, and shall have been obtained by MH at its (and not the Company's) expense, and delivered to the Buyer on or before Closing.

3.5    Conditions to the Selling Parties' Obligation to Close. The Selling Parties' obligation to sell the Assets and to take the other actions required to be taken by the Selling Parties at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by the Selling Parties, in whole or in part);

(a) No Legal Proceedings. No judicial or administrative proceeding shall be pending or threatened that seeks to enjoin or prevent, nor shall any order or injunction have been issued prohibiting consummation of the transactions contemplated hereby;

(b) Fulfillment of Obligations. The Buyer shall have duly performed or complied with all of the material obligations to be performed or complied with by it under the terms of this Agreement at or prior to the Closing Date;

(c) Accuracy of Representations and Warranties. The representations and warranties of the Buyer set forth in Article V hereof shall be true and correct in all material respects as of the date hereof and as of the Closing Date;

(d) Approvals and Notices. All approvals and notices required with respect to the transactions contemplated by this Agreement, including, to the extent necessary, stock exchange approval, shall have been obtained or met; and

(e) Closing Deliveries. The Buyer shall have delivered all of the items listed in Section 3.3 and all of the Transaction Documents.

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES

The Seller, Great Champion and MH, jointly and severally, represent and warrant to the Buyer as follows. For purposes of this Article IV, "Company Material Adverse Effect" shall mean any development that, individually or in the aggregate, (a) constitutes or would be reasonably expected to result in a material adverse effect on the business or financial condition of the Company, taken as a whole, or (b) prevents the Company from consummating the transactions contemplated by this Agreement; provided, however, that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in

8

determining whether there has been, a Company Material Adverse Effect: (i) the direct effects of compliance with this Agreement on the operating performance of the Company, including expenses incurred by the Company in consummating the sale of the Assets or changes in the Company's relationship with its suppliers, customers, or contract partners arising as a result of this Agreement or the sale of the Assets; (ii) changes attributable to or resulting from changes in general economic conditions; (iii) changes affecting the industry in which the Company operates; and (iv) changes directly attributable to acts of terrorism or acts of the public enemy or similar matters.

4.1     Clean Title.  Except as otherwise disclosed on Schedule 4.7(a), Schedule 4.13, and Schedule 4.19, the Seller has good and marketable title to the Assets and the absolute right, power and capacity to sell, assign and transfer the same to the Buyer free and clear of any Liens. Notwithstanding anything to the contrary in any such Schedule, the Selling Parties acknowledge and agree that the Assets are being transferred to the Buyer free and clear of any and all Liens, as provided in Section 1.1.

4.2     Authorization of Agreement and Enforceability.  The Transaction Documents have been duly executed and delivered by the Seller, MH and Great Champion, and constitute the valid and legally binding obligations of the Selling Parties, enforceable in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally and subject to the availability of equitable remedies. Prior to the execution hereof, the requisite number of shareholders of MH have approved and ratified the transactions contemplated by this Agreement, and any remaining shareholders approval consists only of formalities that may be required under applicable stock exchange rules after this Agreement is submitted to the stock exchange authorities.

4.3     Effect of Agreement; Consents to Assignment of Material Agreements.  Neither the execution, delivery, and performance of this Agreement, nor the consummation of the transactions contemplated hereby does or will: (i) conflict with or result in a breach of any provision of the Certificate of Incorporation or Bylaws of the Company; (ii) constitute or result in the material breach of, or conflict with, any material term, condition or provision of, any note, bond, mortgage, indenture or other Material Agreements (other than Licenses, which are addressed by Section 4.4(b)) to which the Selling Parties are  party or by which any of them or any of their respective properties or assets may be bound, except for such conflicts, breaches or defaults as to which written waivers or consents shall have been obtained on or prior to the Closing Date, or that have not had or would not reasonably be likely to have a Company Material Adverse Effect; (iii) violate any law, statute, regulation, judgment, order, injunction, or decree applicable to the Selling Parties or any of their respective properties or assets, except for such violations that have not had or would not reasonably be likely to have a Company Material Adverse Effect; (iv) result in an imposition of any Lien on any of the Assets, or an event which, with the giving of notice, lapse of time, or both, would result in any imposition; or (v) result in any third party having the right to enjoin, rescind or otherwise prevent or impede the transactions contemplated hereby or to obtain any other judicial or administrative relief as a result of any transaction carried out in accordance with the provisions of this Agreement.

4.4     Permits; License Extensions and Licensor Consents.  (a) Except in instances where failure to do so have not had and would not reasonably be likely to have a Company Material Adverse Effect, compliance is not required with any law, rule, or regulation of any government or

9

governmental or regulatory authority, nor is the consent, permit, approval, authorization, or declaration of or notice to any governmental or regulatory authority or other third party required in connection with the execution, delivery, performance, and validity of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of the terms hereof.

(b) On or before the Closing Date, (i) the Seller has caused the licensors under the Licenses (as defined in Section 4.14(a)) listed on Schedule 4.4(b) to agree to an extension of the respective term of such agreements through at least December 31, 2007, provided that the Buyer has in its discretion accepted term sheets or letters of intent from the licensors in such Schedule providing for the requisite extension if the actual extension agreements was not executed before the Closing Date; and (ii) the Seller has caused the licensors under each of the Licenses listed on Schedule 4.4(b) to consent, to the extent required by the terms of such License, to the assignment and transfer thereof to the Buyer.

4.5     Due Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of Minnesota and has full power and authority and all material licenses, and permits required to own, operate or lease its assets and properties and to carry on the Business as currently conducted.  The Company is duly licensed and qualified to do business as a foreign corporation and is in good standing in all jurisdictions where, by the nature of its business or the character and location of its property or personnel, failure to be so licensed or qualified would reasonably be likely to have a Company Material Adverse Effect.  Except as set forth on Schedule 4.5 attached hereto, the Company has all requisite corporate power and authority, and all consents, authorizations, approvals, orders, licenses, certificates, and permits of and from, and declarations and filings with, all federal, state, local, and other governmental authorities and all courts and other tribunals necessary to own, lease, license, use, and operate its properties and other assets and to conduct the Business as presently conducted, except where failure to do so would not reasonably be likely to have a Company Material Adverse Effect.

4.6     Subsidiaries and Partnerships.  The Company does not own, legally or beneficially, any equity interest in any other company, corporation, business trust, partnership, limited partnership, joint venture, or other entity.

4.7     Financial and Business Records.

(a) Financial Statements and Accounting Methods.  Schedule 4.7(a) attached hereto is a list of the unaudited financial statements of the Company for the ten-month period ended October 31, 2006, which have been provided to the Buyer (collectively, the "Financial Statements").  The Financial Statements have been prepared in conformity with Generally Accepted Accounting Principles in the United States ("GAAP") consistently applied (except in each case as described in the notes thereto) and on that basis fairly present (subject, in the case of the unaudited statements, to normal, recurring year-end audit adjustments) the consolidated financial condition, results of operations and cash flows of the Company as of the respective dates thereof and for the respective periods indicated.

(b) Undisclosed Liabilities.  To the knowledge of the Selling Parties, the Company does not have any material liabilities or obligations of a nature required by GAAP to be reflected on a consolidated balance sheet of the Company or in the notes thereto, except (i) as disclosed, reflected or reserved against in the balance sheet and the notes thereto included in the Financial Statements, (ii)

for liabilities and obligations incurred in the ordinary course of business since October 31, 2006 and (iii) for Taxes. This representation shall not be deemed breached as a result of a change in law after the date hereof.

4.8     Absence of Changes.  Since October 31, 2006, the Selling Parties have not taken, caused, allowed to occur or agreed or committed to do, whether in writing or otherwise, any of the following actions or events with respect to the Company and none of such actions or events have been taken or occurred since such date.

(a)  Operations.

(i) cause the Company to (A) create or assume on the Assets any Lien, except in the ordinary course of business and consistent with past practice, (B) change any credit policy as to sales of inventories or change any customer credit approvals, (C) pre-ship any orders in advance of the customer's requested shipment date, (D) pre-bill any customers for sales prior to the actual shipment of goods to the customer, or (E) make any commitment with respect to any of the foregoing matters;

(ii) fail to maintain inventories in accordance with prior practices in the ordinary course of business or to maintain the properties and assets of the Company in good repair, order and condition;

(iii) fail to maintain the Company's books, accounts and records in the usual, regular and ordinary manner on a basis consistent with prior years or change the methods or accounting principles used in maintaining books, accounts or business records;

(iv) extend credit in the sale of products, collection of receivables or otherwise, other than in the ordinary course of business;

(v) any material damage, or destruction, whether or not covered by insurance, adversely affecting the Assets;

(vi) any material adverse change in relationships with personnel, suppliers, subcontractors, customers, distributors, or lessors, except changes in the ordinary course of business;

(vii) any material amendments or other material modifications or changes to any license agreements, or other Contracts, or changes in discretionary costs, such as advertising, maintenance and repairs, research and development, and training;

(viii) fail to maintain and keep in full force and effect all material insurance policies on the Assets; and

(ix) pay any dividend or other distribution of cash or properties by or from the Company to Great Champion  or to any other entity conducting or associated with the Business or to any other equity holders; provided, that the payment by the Company to Great Champion or MH of accounts payable arising in the ordinary course of business shall not be deemed to be a dividend or other distribution of cash or properties within the meaning of this subparagraph (ix) as long as it is consistent with past practice and, without limiting the generality of the foregoing, does not involve any acceleration of payment or other material change in the repayment terms or timing of any

outstanding accounts payable, regardless of when the relevant account payable was created.

(b)  Liabilities and Liens.

(i) borrow any money or guarantee any debt for borrowed money;

(ii) other than in the ordinary course of business and consistent with past practice, incur any material liability or obligation (absolute, accrued, contingent or otherwise) or issue any debt securities or assume, guarantee, endorse or otherwise as an accommodation become responsible for, the obligations of any other individual or entity, or change any assumption underlying, or methods of calculating, any bad debt, contingency or other reserve, any of which could result in a Lien on the Assets or incur a debt or liability other than in the ordinary course of business;

(iii) mortgage, pledge or subject to Lien any of the assets of the Company or agree to do so, other than in the ordinary course of business and in accordance with past practice;

(iv) cancel any material debts or waive any material claims or rights of substantial value or sell, transfer, or otherwise dispose of any of the assets of the Company, except for inventory or accounts in the ordinary course of its business and consistent with past practice; and

(v) make any advances to or investments in or transfers of assets to any Affiliate.

(c)  Employment and Management.

(i) enter into a material employment contract or agreement (oral or written) with any shareholder or employee of the Company or enter into or amend in a material respect any employment, bonus, severance or retirement contract or arrangement, nor increase any salary or other form of compensation payable or to become payable to any directors, officers, executives or employees of the Business (in each case, except for changes or increases consistent with the Company's historical practice in the ordinary course of business); and

(ii) effect or permit to occur any change in the directors or executive officers of the Company.

(d)  Extraordinary Transactions.

(i) merge or consolidate with, purchase all or substantially all of the assets of, or otherwise acquire any business or any proprietorship, partnership, firm, association, corporation or other business organization or division thereof;

(ii) dispose of, mortgage or encumber any of the assets, properties, rights or claims of the Company, other than sales of inventory in the ordinary course of business and in accordance with past practice;

(iii) grant any powers of attorney (other than powers of attorney granted in the ordinary course of business and consistent with past practice with respect to tax or customs matters);

(iv) dispose of or license any material rights to the use of any Intellectual Property, or dispose of or disclose to any party any of the Intellectual Property or trade secrets, not theretofore a matter of

public knowledge; or

(v) purchase, lease or otherwise acquire any real estate or any interest therein.

4.9    Bank Accounts.  Schedule 4.9 attached hereto sets forth an accurate, correct and complete list of all banks and financial institutions in which the Company has an account, deposit, safe-deposit box, lock box or line of credit, factoring arrangement or other loan facility or relationship, including the names of all persons authorized to draw on those accounts or deposits, or to borrow under such lines of credit or other loan facilities, or to obtain access to such boxes.

4.10    Receivables.  Schedule 4.10 attached hereto sets forth the most recent accurate, correct and complete list and aging of all outstanding Receivables. All Receivables are due and valid claims having arisen in the ordinary course of business against account debtors for goods or services delivered or rendered and will be subject to no legitimate setoffs, discounts, credits, reductions, defenses, offsets or counterclaims, except as reserved against in accordance with United States GAAP, consistently applied, and except as already actually deducted from payment. Except as set forth on Schedule 4.7(a), no Receivables are or will be subject to any prior Lien. The Company has not incurred any liabilities for discounts, returns, refunds, allowances or otherwise, except as disclosed on Schedule 4.10.

4.11    Inventory; Purchase Order.  Schedule 4.11 attached hereto sets forth the most recent accurate, correct and complete list of all of the Company's Inventory. All items of Inventory: (i) are valued at the lower of cost or market value, in accordance with United States GAAP, using the first in first out method, it being acknowledged that the Selling Parties have permitted the Buyer to use Company staff to take a physical inventory of the Company's products before the Closing Date; and (ii) contain no material amounts (except as appropriately reserved) that are not of good and merchantable quality, salable and usable for the purposes intended in the ordinary course of the Business. No items are held on consignment by the Company, as consignee or consignor. The dates set forth on the Company's open factory purchase orders are all accurate, and to the Selling Parties' knowledge, the orders are shipping on time and are of appropriate quality.

4.12    Real Property.

(a)    Owned Real Property.  The Company owns no interest in any real property and has no agreements to acquire the title to any real property.

(b)    Leased Real Property.  Schedule 4.12(b) sets forth a complete list of all real property and interests in real property leased by the Company (collectively, the "Leased Real Property"). All of such leases are in good standing and are valid, binding, and in full force and effect. Except as set forth on Schedule 4.12(b), there is not under any such lease any existing material default of the Company or, to the Selling Parties' knowledge, any event which, after notice or lapse of time, or both, would constitute a default or result in a right to accelerate against or loss of rights by the Company. In addition, no notice has been received of any such event or default. The Company is current with respect to all of its payment obligations and enjoys peaceful and undisturbed possession of the Leased Real Property under such leases. The Company has been in peaceable possession of the Leased Real Property since the commencement of the original term of each lease relating thereto.

13

4.13    Tangible Personal Property.

(a) FF&E.  Schedule 4.13 attached hereto sets forth an accurate, correct and complete list of all material trade fixtures, furniture, furnishings, machinery, and equipment used in the Business, whether owned or leased (collectively, the "FF&E").

(b) Computer Assets.  Schedule 4.13 sets forth an accurate, correct and complete list of all electronic data processing and computer equipment used in the Business, whether owned or leased (collectively, the "Computer Assets").

(c) Other Tangible Assets.  Schedule 4.13 sets forth an accurate, correct and complete list of all other material tangible personal property used in the Business, whether owned or leased (collectively, the "Other Tangible Assets").

(d) Condition of Assets.  All of the Vehicles, FF&E, Computer Assets and Other Tangible Assets (collectively, the "Tangible Personal Property") are (A) properly licensed and registered in accordance with and conform to all applicable laws, ordinances and regulations, except for such variations as do not impair or interfere with the use of such assets for the purposes for which they are employed, and the Selling Parties have not received any notice to the contrary, (B) insured as set forth in Schedule 4.13(d), (C) in good operating condition and repair (reasonable wear and tear excepted), suitable for the purposes for which they are presently being used, and are adequate to meet all present and reasonably anticipated future requirements of the Business as presently conducted and (D) not subject to any Lien, other than instances that, individually or in the aggregate, have not had and would not reasonably be likely to have a Company Material Adverse Effect.

4.14    Intellectual Property and Vendor Numbers.

(a) Trademarks, Patents, Etc.  Schedule 4.14(a) attached hereto sets forth an accurate, correct and complete list and summary description of the Intellectual Property other than the license agreements for Intellectual Property that are listed on Schedule 4.15(a) (the "Licenses").  References to Intellectual Property in this Section 4.14 shall not be deemed to include the Licenses (and the Selling Parties are making representations and warranties with respect to such Licenses in Section 4.15).  Neither the Company, nor the Business, has been known by or done business under any name other than those listed in such Schedule.  Except as set forth on Schedule 4.14(a), none of the Intellectual Property is subject to any extensions, renewals, taxes or fees due within ninety (90) days after the Closing Date.  Except as set forth in such Schedule: (i) the Company is the sole and exclusive owner of and/or has the sole and exclusive right to use the Intellectual Property; (ii) no action, suit, proceeding or investigation is pending or to the Selling Parties' knowledge, threatened with respect to the Intellectual Property; (iii) to the Selling Parties' knowledge, none of the Intellectual Property interferes with, infringes upon, conflicts with or otherwise violates the rights of others or is being interfered with or infringed upon by others, and none is subject to any outstanding order, decree, judgment, stipulation or charge; and (iv) there are no royalty, commission or similar arrangements, and no licenses, sublicenses or agreements, pertaining to any of the Intellectual Property; and (v) to the knowledge of the Selling Parties, neither the Seller nor MH has agreed or is obligated to indemnify any person for or against any infringement of or by the Intellectual Property, except in the ordinary course of business or as required by law.  To the knowledge of the Selling Parties, the Seller is not infringing upon any patent, patent license, trade secret, trademark, copyright, service mark,

14

franchise, service name, trade name, or assumed name or application or registration therefor which is owned or held by or pending with respect to any person or entity, and there is no claim or action by any such person or entity pending or, to the knowledge of the Selling Parties, threatened with respect thereto.

(b) Trade Secrets, Proprietary Information and Know-How. All trade secrets, proprietary information and know-how utilized in the Business are owned solely and exclusively by the Company and the Company has been responsible for the development of such information. All such information has been maintained in confidence and is in the possession of the Company as of the Closing Date.

(c) Software and Information Systems. The Company has all necessary right, title and interest to all electronic data processing systems, information systems, computer software programs, program specifications, charts, procedures, source codes, input data, routines, data bases and report layouts and formats, record file layouts, diagrams, functional specifications and narrative descriptions, flow charts and other related material used in the Business (collectively the "Software") other than any such items that, individually or in the aggregate, have not had and would not reasonably be likely to have a material adverse effect on the Business.

(d) Vendor Numbers. Set forth on Schedule 4.14(d) is a list of all vendor numbers used by the Company, and the customers to which each such number relates.

4.15    Agreements; Permits and Licenses.

(a) Material Agreements. Schedule 4.15(a) attached hereto sets forth a correct and complete list of all Material Agreements (as hereinafter defined) (except for the leases relating to the Leased Real Property and Tangible Personal Property, which are set forth on Schedules 4.12(b) attached hereto). With regard to the Material Agreements, to the Selling Parties' knowledge: (i) all such Material Agreements are in full force and effect and are in good standing, valid, binding and enforceable in accordance with their respective terms; (ii) no material amounts payable under any Material Agreement are past due; (iii) each party thereto has complied with all material commitments and obligations on its part to be performed or observed under each Material Agreement; and (iv) the Selling Parties have not received any notice of a default, offset or counterclaim under any Material Agreement, or any other communication calling upon the Selling Parties to comply with any provision of any Material Agreement or asserting noncompliance, and no event or condition has happened or presently exists which constitutes a default or, after notice or lapse of time or both, would constitute a default under any Material Agreement. The Seller has delivered to the Buyer a true and correct copy of each Material Agreement. For purposes of this Agreement, "Material Agreements" shall mean any and all of the following agreements: (i) loan and credit agreements (including, without limitation, letter of credit facilities), factoring agreements, security agreements, guarantees, notes, conditional sales agreements, leasing agreements (including the leases for all Tangible Personal Property and the Leased Real Property), sale-leaseback agreements or title retention agreements; (ii) purchase orders and/or other contracts and commitments for the future purchase of materials, supplies or equipment in excess of the requirements for normal operating inventories or for business booked as of the date hereof; (iii) contracts, agreements, indentures, instruments or commitments by and between the Company and any person or entity with whom the Company is not dealing at arm's length; (iv) all Licenses, and employment and sales/agency contracts

or agreements of non-competition, non-disclosure and/or confidentiality; (v) management or service contracts or agreements, and contracts and agreements with independent contractors and sub-contractors, other than those which arise in the ordinary course of business or provide for the payment in any twelve (12) month period of $50,000 or less in the aggregate; (vi) customer purchase orders accepted by or on behalf of the Company (A) providing in one instance or in the aggregate for the shipment of goods having a listed price of more than $50,000, or (B) in respect of which the Company has been paid in advance or has received any prepayment; (vii) any contract for the purchase of equipment or any construction or other similar agreement involving any expenditure in excess of $50,000; (viii) any purchase order, agreement or commitment (but not including closeouts in the normal course of business) obligating the Company to sell or deliver any product at a price which does not cover the cost (including labor, materials and production overhead) associated with such product; (ix) any joint venture, partnership or other cooperative arrangement or any other agreement involving the sharing of profits; (x) any sales or buying agency agreements or arrangements, brokerage, distribution, license, consignment or similar contracts or agreements, other than the contracts or agreements entered into in the normal course of business and terminable by the Company without payment or penalty on 60 days (or less) notice; (xi) any deed, easement, agreement or other instrument affecting any right, title or interest in or to real property; (xii) any contract or option for the purchase or sale of any assets other than in the ordinary course of business; and (xiii) all contracts, agreements, indentures, instruments and commitments, other than those described in (i) through (xii) above, (A) arising in the ordinary course of business or providing for the payment in any twelve (12) month period of $50,000 or more in any one instance or in the aggregate, (B) not arising in the ordinary course of business and providing for the payment in any twelve (12) month period of $50,000 or more in any one instance or in the aggregate, (C) having a term (including extensions) in excess of twelve (12) months, (D) not terminable without payment or penalty on 60 days (or less) notice, or (E) between the Company and any of the Selling Parties or another Affiliate.

(b) Permits and Licenses. Schedule 4.15(b) attached hereto sets forth a correct and complete list of each governmental license, permit or other similar authorization affecting, or relating in any way to, the Business (collectively, the "Permits"), together with the name of the government agency or entity issuing the same except normal routine items (such as, without limitation, local business permits, auto and truck license tags, building permits, etc., which normally relate to the business of designing and marketing the products for or to the Business). Except as set forth on such Schedule, such Permits are valid and in full force and effect and are transferable by the Company to the Buyer, and none of the Permits will be terminated or impaired or become terminable as a result of the transactions contemplated hereby.

4.16    Employment/Labor Matters.

(a) Employees. Schedule 4.16(a) attached hereto contains an accurate, correct and complete list and summary description of the name, position, length of service, and present rate of compensation, direct and indirect, of all of the Company's employees, and any employment or other agreement providing for the employment or the supply of services by any person to the Company for a fixed duration. Except as set forth on Schedule 4.16(a), the services of substantially all of the Company's employees (the "Employees") will continue to be available on substantially the same terms and conditions to the Company after the date hereof, if and to the extent the Buyer elects to avail itself of such services. All Employees are employees at will. There are no disputes pending or

to the Selling Parties' knowledge threatened, involving any Employee, and the Company and, without limiting the generality of the foregoing, as of the Closing Date the Company shall have no liability to David Briskie other than the gratuity payments referenced in Section 1.5. The Company is not obligated by or subject to any collective bargaining agreement, the selection of a collective bargaining representative for the Employees, any order of any labor board or administrative agency, labor dispute, labor board proceeding, grievance proceeding or unfair labor practice proceeding or practice decision relating to the Employees. There is no unfair labor practice or age or sex discrimination complaint against the Company pending or to the Selling Parties' knowledge threatened before the National Labor Relations Board or any other (Federal, state, or local) board, department, commission, or agency. In the last five (5) years, there has not been and to the Selling Parties' knowledge there is not presently pending or existing any strike, slowdown, picketing, work stoppage, or other labor disruption against or affecting, or threatened against, the Company. No application for certification of a collective bargaining unit has been instituted or is pending or to the Selling Parties' knowledge is threatened. No Employee will become entitled to any retirement, severance or similar benefit or enhanced benefit solely as a result of the transactions contemplated hereby. With regard to the Employees, the Company has complied with all laws, rules and regulations relating to the employment of labor, including provisions relating to wages, hours, overtime, equal opportunity, occupational health and safety, severance, collective bargaining and the payment of social security and other taxes except for instances of noncompliance that, individually or in the aggregate, would not reasonably be likely to have a Company Material Adverse Effect.

(b)    Employee Benefit Plans.  Schedule 4.16(b) attached hereto includes a list of each "employee benefit plan", as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which: (i) is maintained or sponsored by the Company or any of their ERISA Affiliates (as hereinafter defined); and (ii) covers any Employee (collectively, the "Employee Benefit Plans"). Except as set forth on Schedule 4.16(b), each Employee Benefit Plan which is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), has received a favorable determination letter from the Internal Revenue Service regarding such qualification, and each Employee Benefit Plan has been maintained in compliance in all material respects with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations, including, but not limited to, ERISA and the Tax Code, which are applicable to such Employee Benefit Plan. No Employee Benefit Plan is a Multiemployer Plan (as hereinafter defined) and no Employee Benefit Plan is subject to Title IV of ERISA. Neither the Company, nor any of its ERISA Affiliates, has incurred or will incur any liability under Title IV of ERISA relating to any Employee Benefit Plan that could become, after the Closing Date, an obligation of the Buyer or any of its Affiliates. The Seller has furnished to the Buyer copies of each Employee Benefit Plan and the most recent Internal Revenue Service determination letters with respect to each such Employee Benefit Plan. For purposes of this Agreement: (i) "ERISA Affiliate" of any entity shall mean any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Tax Code; and (ii) "Multiemployer Plan" shall mean each Employee Benefit Plan that is a multiemployer plan, as defined in Section 3(37) of ERISA.

(c)    Employee Benefit Arrangements.  Schedule 4.16(c) attached hereto includes a list of each employment, severance or other similar contract, arrangement or policy (written or oral) and each plan or arrangement (written or oral) providing for insurance coverage, medical benefits (including any self-insured arrangements), workers compensation, disability benefits, supplemental

17

unemployment benefits, vacation benefits, retirement benefits or for deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement or employment insurance, compensation or benefits which: (i) is not an Employee Benefit Plan; (ii) is entered into, maintained or contributed to, as the case may be, by the Company or any of its ERISA Affiliates; and (iii) covers any Employee (collectively, the "Employee Benefit Arrangements"). Copies or descriptions of all Employee Benefit Arrangements have been made available or furnished previously to the Buyer. Each Employee Benefit Arrangement has been maintained in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations which are applicable to such Employee Benefit Arrangement. Neither the Company, nor any of its ERISA Affiliates, have incurred or will incur any liability, other than the payment of the benefits described thereunder, relating to any Employee Benefit Arrangement that could become, after the Closing Date, an obligation of the Buyer or any of its Affiliates. No Employee is eligible for payments that would constitute "parachute payments" under Section 280G of the Tax Code or for other severance or separation type payments. Schedule 4.16(c) lists (i) all bonuses that were paid by MH to Employees for the ten-month period ended on October 31, 2006 and all corresponding bonus arrangements and (ii) all bonuses due by Seller or MH to Employees after the date hereof.

(d)  _Contributory Plans._ With respect to each Employee Benefit Plan or Employee Benefit Arrangement to which the Company is required to make or have made contributions (hereinafter referred to as "Contributory Plans"): (i) each of the Contributory Plans is in material compliance, and has been administered in accordance with its terms and the applicable law; (ii) the Company has not incurred any funding deficiency in connection with any of the Contributory Plans which constitute an Employee Benefit Plan and each of such plans is fully funded; (iii) none of the Contributory Plans or any related trusts has been terminated; and (iv) as of the most recent valuation date for each of the Contributory Plans, the present value of the accrued benefits (as computed by the actuaries for such Contributory Plan using the actuarial assumptions in effect for such purposes as reflected in the most recent actuarial report or valuation for such Contributory Plan) of all participants and former participants in such Contributory Plan did not, and as of the date hereof such present value will not, exceed the fair market value of its assets.

(e)  _Independent Representatives._ Schedule 4.16(e) attached hereto contains a complete and correct list of the independent sales representatives of the Company (the "Sales Reps") and a summary of the sales volume (or, in the alternative, commission volume) of each such Sales Rep for the ten-month period ended October 31, 2006 and the material terms of the commission and expense arrangements or written agreements between the Company and each such Sales Rep. None of the Sales Reps has claimed that he, she or it has a written agreement with the Company obligating the Company or its successors to continue to engage such representative with respect to sales of the Company beyond the term of his, her or its agreement. There are no facts or circumstances which may give rise to any material dispute between any such representative and the Company.

4.17  _Customers, Contractors and Suppliers._ All outstanding contracts and orders with customers, contractors and suppliers of the Business were entered into by or on behalf of the Company in the ordinary course of business and consistently with past practice. Schedule 4.17 attached hereto sets forth an accurate, correct and complete list of the twenty-five (25) largest customers, and five (5) largest suppliers of the Business, on a consolidated basis determined on the

basis of revenues from items sold (with respect to customers) or costs of items purchased (with respect to suppliers) for the ten-month period ended October 31, 2006. None of the Selling Parties knows of any fact, condition or event which is presently materially adversely affecting or in connection with the execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby or the fulfillment of the terms hereof could materially adversely affect the relationship of the Business with any major customer or supplier.

4.18    Insurance. The Seller and MH have provided the Buyer with an accurate, correct and complete list and summary description (including the name of the insurer, coverage, premium and expiration date) of all policies of insurance, insurance programs or fidelity bonds (collectively, the "Insurance") maintained by the Company or in which the Company is a beneficiary or a named insured. All such policies or binders are in full force and effect and are in amounts and for risks, casualties and contingencies customarily insured against by enterprises in operations similar to the Business. There are no pending or asserted claims by the Company against any Insurance as to which any insurer has denied liability, and there are no claims under any Insurance that have been disallowed or improperly filed. The Selling Parties have provided the Buyer with accurate, correct and complete information regarding the Company's claims experience for the last five (5) fiscal years for all single claims exceeding Ten Thousand Dollars ($10,000) and the interim period through the date hereof with respect to the Business (both insured and self-insured). No notice of cancellation or non-renewal with respect to, or material increase of premium for, any Insurance has been received by the Company.

4.19    Absence of Undisclosed Liabilities; Liens. Except to the extent reflected in the Financial Statements or as listed on Schedule 4.19 attached hereto, as of October 31, 2006, to the knowledge of the Selling Parties, the Company has no debts, obligations, commitments or liabilities of any nature, whether absolute, accrued, contingent or otherwise and whether direct or indirect, primary or secondary, due or to become due, and since the date of the Financial Statements (October 31, 2006) the Company has not incurred any liabilities other than in the ordinary course of business on terms and conditions and in amounts consistent with past practices. Schedule 4.19 also identifies all Liens against or relating to the Assets and except as set forth on such Schedule there is, to the knowledge of the Selling Parties, no basis for the assertion of any more Lien.

4.20    Taxes.

(a)    Filings. The Company and any body corporate, partnership or trust in which it directly or indirectly owns an interest (collectively, the "Taxpayers") has filed or sent all returns, reports, and all information returns and statements (collectively, the "Returns") required to be filed or sent with respect to all foreign, federal, state, county, local and other taxes of every kind and however measured, including (without limitation) income, gross receipts, excise, franchise, property, value added, import duties, employment, payroll, sales and use taxes and any additions to tax and any interest or penalties thereon (collectively, the "Taxes") for any period ending on or before the date hereof. As of the time of filing, the Returns correctly reflected the income, business, assets, operations, activities and status of the relevant Taxpayers and any other information required to be shown thereon. All such returns are complete and accurate and disclose all Taxes required to be paid for in the periods covered thereby. Each Taxpayer has timely paid or made provision for all Taxes required to be paid prior to the date hereof. All required Tax estimates, deposits, prepayments and

19

similar reports or payments for current periods have been properly made. No Taxpayer is delinquent in the filing of any Return or the payment of any Tax. The Taxpayers have timely requested any extension of time within which to file any Return. The Seller has delivered to the Buyer accurate, correct and complete copies of all foreign, federal, state, county, local and other income tax Returns for the last five (5) most recently completed fiscal years.

(b) _Compliance_. Each Taxpayer has withheld amounts from employees and others working in the Business, as required under applicable law, and has filed all Returns with respect to employee income tax withholding and social security and unemployment taxes in compliance with the tax withholding provisions of all applicable laws.

(c) _Disputes_. There are no Tax Liens on any assets of any Taxpayer and no basis exists for the imposition of any such Liens. Except as set forth on Schedule 4.20(c) attached hereto, within the past seven (7) years no material adjustment of or deficiency for any Tax or claim for additional Taxes has been proposed, threatened, asserted or assessed against the Company and no such adjustment, deficiency or claim relating to fraud has ever been assessed against the Company. Except as set forth on Schedule 4.20(c), no Taxpayer has any dispute with any taxing authority as to Taxes of any nature and there are no audit examinations being conducted or threatened, and there is no deficiency or refund litigation or controversy in progress or threatened, with respect to any Taxes previously paid by any Taxpayer or with respect to any Returns previously filed by or on behalf of any Taxpayer. No Taxpayer has any extension or waiver of any statute of limitations relating to the assessment or collection of Taxes. Except as set forth on Schedule 4.20(c), no consent, agreement or other undertaking has been filed by any Taxpayer. The Company has not been included in any unitized, affiliated, combined or otherwise consolidated Returns filed by any Taxpayer.

4.21    Product Warranty/Liability. There are no written warranties, written warranty policies, service, maintenance agreements and product liability insurance coverage of the Business. Each of the products presently heretofore manufactured, constructed, assembled, distributed, sold or produced by the Company in connection with the Business contains warranties which are in conformity with the labeling and other requirements of all applicable laws and conformed to such warranties. To the knowledge of the Selling Parties, except as set forth on such Schedule, there have not been any liabilities, claims or obligations arising from or alleged to arise from any actual or alleged injury to persons or property as a result of the ownership, possession or use of any product sold by the Company prior to the date hereof and any such liability, claim or obligation would be fully covered by product liability insurance of the Company. The Company has heretofore only sold to customers products to which the Company had good title.

4.22    Litigation. Neither the Seller nor MH is engaged in or a party to or, to the knowledge of the Selling Parties, threatened with any suit, action, proceeding, investigation or legal, administrative, arbitration or other method of settling disputes or disagreements or governmental investigation, which relates to the Business, and there is no basis for any such action. There is no order or injunction issued prohibiting consummation of the transactions contemplated hereby. There is no judicial, administrative or other proceeding, investigation or inquiry pending or, to the knowledge of the Selling Parties, threatened seeking to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of, this Agreement or the consummation of the transactions contemplated hereby, or which could reasonably be expected to: (i) impair or

interfere in any material respect with Buyer's ownership or operation of the Company or the Business; (ii) result in a Company Material Adverse Effect; or (iii) result in any material liability to the Buyer.

4.23    Compliance with Law. To the knowledge of the Selling Parties, the Company is in compliance in all material respects with all statutes, laws, ordinances, rules or regulations; provided, that the Company's representations with respect to Taxes is set forth in Section 4.20. No notice from any governmental body or other person of any violation of any statute, code, ordinance, law, rule or regulation has been served upon the Company. The Selling Parties and to the knowledge of the Selling Parties, any officer, agent or employee of the Company on behalf of the Company: (i) have not made any unlawful domestic or foreign political contributions; (ii) have not made any payment or provided services which were not legal to make or provide or which such parties should have known were not legal for the payee or the recipient of such services to receive, (iii) have not received any payments, services or gratuities which were not legal to receive or which such parties should have known were not legal for the payor or the provider to make or provide, (iv) have not had any transactions or payments which are not recorded in its accounting books and records or disclosed in their financial statements, (v) have not had any off-book bank or cash accounts or "slush funds", (vi) have not made any payments to governmental officials in their individual capacities for the purpose of affecting their action or the action of the government they represent to obtain special concessions, or (vii) have not made illegal payments to obtain or retain business. None of the Selling Parties, nor any of their assets, is a party to any settlement agreement or instrument, or subject to any other corporate restriction or any judgment, order, writ, injunction, decree, rule, regulation, code, or ordinance which would reasonably be expected to have a Company Material Adverse Effect.

4.24    Environmental Matters.

(a)    Facilities; Permits.  The use and/or operation by the Company of each facility (all references to "facility" in this Section being deemed to include the Leased Real Property) used in the Business ("Facilities") have been and are in compliance with all applicable Environmental Laws (as hereinafter defined), and except for instances of noncompliance that, individually or in the aggregate, would not reasonably be likely to have a Company Material Adverse Effect.  The Company has not received any notice of non-compliance. There are no actions, claims, proceedings, or investigations, pending or, to the knowledge of the Selling Parties, threatened against the Company with respect to the Facilities and their operation for either existing or alleged violations of any Environmental Laws. The Company holds all permits, certificates, approvals, registrations and licenses ("Environmental Permits") required by all applicable Environmental Laws, the Facilities and their operation are in material compliance with all Environmental Permits and all such Permits are valid and in full force and effect.  For purposes of this Agreement, "Environmental Laws" shall mean all applicable statutory, administrative and civil law relating to the protection of human health or the environment, including: (i) all requirements pertaining to reporting, licensing, limiting, permitting, investigating and/or remediation of emissions, discharges, releases or threatened releases of Hazardous Substances (as hereinafter defined) or of any other substance, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, Hazardous Substances, whether solid, liquid or gaseous in nature; (ii) all requirements pertaining to the protection of the health and safety of employees or the public; and (iii) all environmental, health and safety laws governing the

41

manufacturing and other activities of the Company and its contractors.

(b) Contamination and Hazardous Substances. To the knowledge of the Selling Parties, the Company has in connection with the Facilities and their operation, received, handled, generated, used, stored, deposited, labeled, treated, documented, transported and disposed of any Hazardous Substances in material compliance with all Environmental Laws. The Company has not engaged in operations which have caused or permitted the release or discharge of Hazardous Substances anywhere so as to create any material existing or contingent liability of the Company for response costs, damages or penalties. For purposes of this Agreement, "Hazardous Substances" shall mean any asbestos, flammable substances, explosive or radioactive materials, PCB-laden oil, PCBs, hazardous materials, hazardous waste, pollutants, contaminants, toxic substances, pollution or related materials specified as such in, or regulated under federal, state, municipal or local laws, ordinances, rules, or regulations governing the Company's activities or related to use, storage, treatment, transportation, manufacture, refinement, handling production or disposal of such materials.

(c) Investigations and Studies. There have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or which are in the possession of the Selling Parties in relation to any property or facility presently owned or leased by the Company in connection with the operation of the Business.

4.25  No Brokers. Neither the Seller nor MH or Great Champion has retained or engaged an investment banker, broker, finder, agent or similar intermediary or incurred a liability or obligation for brokerage fees, commissions or finder's fees, nor had any communications or dealings with any broker or finder, with respect to this Agreement or the transactions contemplated hereby.

4.26  Suitability and Completeness of Asset. The assets of the Company are adequate and suitable for the conduct of the Business and comprise the capacity and rights to develop, use, sell, ship and deliver the products of the Business and to perform the same services in the same manner as presently being performed by the Company.

4.27  Reliance on Representations and Warranties. Buyer is relying on the representations and warranties set forth herein regardless of whether Buyer has actual or constructive notice of any fact or occurrence that makes or would make any such representation or warranty inaccurate, false or incomplete.

ARTICLE V - REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows.

5.1  Corporate Organization and Authority. The Buyer is a limited liability company duly organized and validly existing under the laws of the State of New York, is in good standing under the laws of such state, and has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

5.2  No Conflicts; Approvals.

(a) Authorization. The execution and delivery of this Agreement by the Buyer and the

22

# EXHIBIT 1, PART II

consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer. This Agreement is a valid and binding obligation of the Buyer, enforceable in accordance with the terms hereof, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors rights generally and subject to the availability of equitable remedies.

(b)  Conflicts.  The execution and delivery by the Buyer of this Agreement, the consummation of the transactions contemplated hereby and its compliance with any of the provisions hereof will not: (i) conflict with or result in a breach or violation of or a default under any provision of the organizational documents of the Buyer (ii) result in a default (or give rise to any right of termination, cancellation, or acceleration) under any of the terms, conditions, provisions of any note, bond, mortgage, deed of trust, commitment, indenture, lease, guarantee, authorization, franchise, license, permit, agreement, security agreement or any other instrument or obligation to which the Buyer is a party; (iii) violate any judgment, order, writ, injunction, decree, statute, rule, or regulation applicable to the Buyer; (iv) result in an imposition of any Lien on any asset of the Buyer, or an event which, with the giving of notice, lapse of time, or both, would result in any such imposition; or (v) result in any third party having the right to enjoin, rescind or otherwise prevent or impede the transactions contemplated hereby or to obtain any other judicial or administrative relief as a result of any transaction carried out in accordance with the provisions of this Agreement.

(c)  Approvals, Consents and Notices.  Except as otherwise disclosed on Schedule 5.2(c) attached hereto, compliance is not required with any law, rule, or regulation of any government or governmental or regulatory authority, nor is the consent, license, approval, authorization, or declaration of or notice to any landlord, mortgagee, secured party, governmental or regulatory authority or other third party required of or by the Buyer in connection with the execution, delivery, performance, and validity of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of the terms hereof.

5.3    No Brokers.  The Buyer has not retained or engaged an investment banker, broker, finder, agent or similar intermediary or incurred a liability or obligation for brokerage fees, commissions or finder's fees, nor had any communications or dealings with any broker or finder, with respect to this Agreement or the transactions contemplated hereby.

## ARTICLE VI - CERTAIN AGREEMENTS AND COVENANTS OF THE PARTIES

The Parties covenant and agree as follows.

6.1    Relationship of the Parties following Consummation of Transactions.

(a) Cooperation in Litigation.  It is recognized that in the future, litigation, collection matters or tax matters may arise relating to the Business and the conduct thereof, which may relate directly or indirectly to the period prior to the Closing Date or the period subsequent to the Closing Date, or both. The Parties agree therefore, that to the extent reasonable under the circumstances, they will assist and provide information, records, and documents to any other Party with respect to any such litigation or potential litigation or matters in which the other Party is or may be involved.

(b) Further Assurances.  The Parties agree: (i) to cooperate in any reasonable arrangement

23

designed to provide for the Buyer the benefits of the Business; and (ii) that at any time and from time to time after the Closing Date, each of them will, upon the request of the other, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required for the better carrying out and performance of all the terms of this Agreement.

6.2    Non-Competition.  For a period of seven (7) years following the Closing Date, neither the Selling Parties nor any of their affiliates shall, on their behalf or on behalf of any other individual or entity, directly or indirectly, in any capacity whatsoever, carry on or be engaged in, or have any financial or other interest in, or be commercially involved in, any endeavor, activity or business which is the same as or in competition with the Business in the United States as currently conducted or proposed to be conducted, or that sells directly to any retailers located within the United States, or that solicits or sells to any such retailer directly.  The parties acknowledge that the Manufacturing Agreement provides  (among other things) for the manufacture of products by MH for the Buyer and its affiliates until April 3, 2014, and the establishment of a new factory facility to conduct the manufacture of such products, and that the duration and scope of the covenant not to compete and of the other covenants set forth in this Article VI constitute an essential inducement for the Buyer to enter into this Agreement and to agree to cause the Buyer to enter into the Manufacturing Agreement, and that it is essential to protect the legitimate expectation of the Buyer in connection with these transactions.  Notwithstanding the foregoing, the Selling Parties may own or hold equity securities (or securities convertible into, or exchangeable or exercisable for, equity securities) of companies or entities that engage in the Business; *provided, however,* that (i) such equity securities are publicly traded on a securities exchange, and (ii) the Selling Parties' aggregate holdings of such securities do not exceed at any time one percent (1%) of the total issued and outstanding equity securities of such company or entity.

6.3    Non-Solicitation of Customers.  Except as set forth in the Manufacturing Agreement, for a period of seven (7) years following the Closing Date, the Selling Parties and their affiliates shall not, on their behalf or on behalf of any other individual or entity, directly or indirectly, in regards to products competitive with those of the Business as currently conducted or proposed to be conducted: (i) canvas or solicit the business of (or procure or assist the canvassing or soliciting of the business of) any customer of the Business; (ii) accept (or procure or assist the acceptance of) any business from any customer of the Business; or (iii) supply (or procure or assist the supply of) any goods or services to any customer of the Business.

6.4    Non-Solicitation of Employees.  For a period of seven (7) years following the Closing Date, the Selling Parties and their affiliates shall not, on their behalf or on behalf of any other individual or entity, directly or indirectly, in any capacity whatsoever: (i) solicit the employment or engagement of or otherwise entice away from the employment of the Business any individual who is employed by the Business, whether or not such individual would commit any breach of his or her contract or terms of employment by reason of leaving the employ of the Buyer; or (ii) procure or assist any individual or entity to solicit the employment or engagement of or otherwise entice away from the employment of the Business any individual who is employed by the Business whether or not such individual would commit any breach of his contract or terms of employment by reason of leaving the employ of the Business.

6.5   Confidentiality.

(a) Covenant. The Selling Parties and their affiliates each agrees to hold in confidence, not to disclose to others and not to use for any purpose other than in connection with the transactions contemplated hereby, any and all confidential information (as defined in subparagraph (c) below), except to their respective attorneys, accountants, bankers, selected employees and advisors and any parties as required by applicable law, rule, regulation or court order.

(b)   Covenant Exceptions.   The Selling Parties' foregoing obligations of confidence, non-disclosure and non-use shall not apply to the following categories of information: (i) information which was in the public domain or public knowledge; or (ii) information which hereafter becomes in the public domain or public knowledge except by breach of this agreement by a Selling Party.

(c)   Covenant Expiration.   The foregoing obligations of confidence, non-disclosure and non-use shall survive the date hereof and continue until the applicable statute of limitations have expired.

(d)   Confidential Information.   The confidential information herein shall include all information related to the Business or the Buyer, or any of their affiliates (including but not limited to U.S.P.A. Accessories, LLC) including but not limited to: customer lists, invoices, price lists and information, samples, process descriptions, manufacturing processes, business methods, business policies, procedures, techniques, research and development projects and results, trade secrets, writings, models, designs, artwork, advertising and sales materials, data processing reports, customer sales analyses, computer programs, technical data, research information, product data, documents, specifications, diagrams, charts, marketing studies, and other knowledge and processes and projections, proposed business, future marketing or product development or brand extension plans, financial information, and other information relating to customers, suppliers, distributors, projects under consideration or bid, profits, costs, pricing or tooling, names, addresses and contacts of customers, clients, suppliers and distributors, and any and all data on or relating to past, present and/or prospective customers or clients.

6.6   Announcement. Following the execution of this Agreement, the Parties shall approve a joint announcement so as to satisfy the requirements of any public disclosure applicable to the Parties, such approval not to be unreasonably withheld by any Party. In addition, the Parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

6.7   Expenses. Except as otherwise expressly provided herein, each Party shall pay its or their own expenses incidental to the preparation of this Agreement and incurred by it or them in connection with the transactions hereby effected. Each of the Parties covenants and agrees to indemnify and hold the other Parties harmless from and against any loss, cost, damage, expense (including reasonable attorney's fees and expenses) and liability resulting from any claims that may be made against the others by any other broker or party claiming a fee or other compensation in connection with the transactions contemplated by this Agreement, arising from the acts of the indemnifying party.

6.8    Employees. Except as set forth on Schedule 4.16(a), Buyer will employ all Employees of the Company as of the Closing Date, provided that except as disclosed in Schedule 4.16(a) all Employees are employed at will and may be freely discharged or terminated after the date hereof, subject only to applicable civil rights laws.

6.9    Collection of Receivables. The parties shall collaborate to insure that any Receivable that is transferred to the Buyer at Closing is remitted to the Buyer by the relevant customer. If payment of any Receivable that is transferred to the Buyer at Closing is being remitted to any Selling Party or any of its affiliates, the Seller shall promptly notify the Buyer and remit (or cause it Affiliates to remit) to the Buyer the full amount of the Receivable. The Buyer shall have the right to audit the books and records of the Selling Party and any affiliate, including but not limited to bank account statements, for purposes of determining their respective compliance with the provisions of this Section 6.9.

6.10    Conduct of Business in the Ordinary Course. The Selling Parties covenant and warrant that from the date hereof until the Closing Date, the Company shall be operated in the ordinary course of business and consistent with past practice, and without limiting the generality of the foregoing none of the actions or events set forth in Section 4.8 shall have been taken or occurred during such period without the prior written consent of the Buyer.

## ARTICLE VII - INDEMNIFICATION

7.1    Survival of Representations and Warranties. Subject to the limitations and other provisions of this Agreement, the representations and warranties of the Selling Parties contained Article IV hereto shall survive the Closing and remain in full force and effect for a period of eighteen (18) months after the Closing Date; provided that (i) the representations and warranties contained in Section 4.23 (Compliance with Law), Section 4.20 (Taxes) and Section 4.24 (Environmental Matters) shall survive and remain in full force and effect until the expiration of the applicable statute of limitations and (ii) the representations and warranties contained in Section 4.1 (Title to Assets), Section 4.2 (Authorization of Agreement and Enforceability), Section 4.3 (Effect of Agreement) and Section 4.5 (Due Organization) shall survive and remain in full force and effect indefinitely. The representations and warranties of Buyer contained in Article V hereto shall survive the Closing and remain in full force and effect for a period of eighteen (18) months after the Closing Date. The covenants and agreements of the Selling Parties and Buyer contained in this Agreement shall survive and remain in full force and effect for the applicable period specified therein, or if no such period is specified until the expiration of the applicable statute of limitations. The provisions of this Article VII shall survive for so long as any other Section of this Agreement shall survive. Any Indemnification Claim (as hereinafter defined) for breach of any of the representations and warranties subject to the foregoing survival period must be asserted in writing prior to the end of the applicable survival period, and if asserted in writing on or before the expiration of the applicable survival period, such claims shall survive until resolved or judicially determined, and if not so asserted, then the Parties shall be forever estopped and prohibited from asserting any such Indemnification Claim (as defined below) hereunder.

7.2    Indemnification of the Buyer. The Selling Parties, jointly and severally, shall indemnify and hold the Buyer and the Company harmless against and in respect of any and all claims, demands, losses, costs, expenses (including court costs and reasonable attorney fees), obligations,

26

liabilities, damages, suits, causes of action, deficiencies, taxes, interest, penalties, or late fees on taxes or otherwise (collectively the "Indemnification Claims"), that the Buyer may suffer or incur which arise or result from or relate to:

      (a)    any misrepresentation or breach of warranty;

      (b)    any non-fulfillment of any covenant or agreement on the part of any Selling Party hereunder;

      (c)    any and all Taxes (including but not limited to any Tax that may be imposed with respect to payments by any employee or officer of the Company on behalf of the Company to any other employee, officer, contractor, or supplier for any work or services, or with respect to payments from the Company to MH or any other affiliates), any unaccrued or unreported Tax liabilities, and any costs of defending, investigating, or otherwise dealing with any Tax investigation or audit, with respect to the Company for all periods prior to and including the Closing Date; and

      (d)    the failure of MH and the Selling Party to remit the entire amount of the 2005 Tax Refund as provided in Section 1.4(a) above.

    7.3    <u>Indemnification of the Selling Parties</u>.  The Buyer shall indemnify and hold the Selling Parties harmless against and in respect of any and all Indemnification Claims that the Selling Parties may suffer or incur which arise or result from or relate to any misrepresentation, breach of warranty, or nonfulfillment of any covenant or agreement on the part of the Buyer hereunder

    7.4 <u>Notices and Claim Procedure</u>.

    (a)   <u>General Requirements</u>.  Any Party who or which may be entitled to a right to recover indemnification pursuant to this Agreement (the "Indemnified Party"): (i) shall give the persons or entities required to make such indemnification (the "Indemnifying Party") notice (which shall include all facts known to the Indemnified Party giving rise to such right and an estimate of the amount thereof) of the Indemnification Claim and any Third Party Claim (as hereinafter defined) relating to such right (the "Indemnification Notice") within a reasonable time after receipt thereof; (ii) prior to taking any material action with respect to a Third Party Claim, shall consult with the Indemnifying Party as to the procedure to be followed in defending, settling, or compromising the Third Party Claim; (iii) shall not consent to any settlement or compromise of the Third Party Claim without the written consent of the Indemnifying Party (which consent, unless the Indemnifying Party has elected to assume the exclusive defense of such Indemnification Claim, shall not be unreasonably withheld or delayed); and (iv) shall permit the Indemnifying Party, if it so elects, to assume the defense of such Third Party Claim (including, except as provided below, the compromise or settlement thereof) at its own cost and expense.  For the purposes of this Agreement, "Third Party Claim" shall mean any Indemnification Claim by any third party which gives rise or could reasonably be expected to give rise to a right of indemnification hereunder.

    (b)   <u>Defense of Claim</u>.  The parties shall attempt in good faith to resolve their respective rights and obligations with respect to any Indemnification Claim (including but not limited to any Third Party Claim), as promptly as reasonably practicable after an Indemnification Notice is given by an

Indemnified Party. If the Indemnifying Party shall elect to assume the defense of a Third Party Claim pursuant to this Agreement, or to accept liability hereunder for any other Indemnification Claim, it shall notify the Indemnified Party in writing of such election. The Indemnifying Party shall not compromise or settle any such Third Party Claim without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed). Notwithstanding the foregoing, the party which defends any Third Party Claim shall, to the extent required by applicable insurance policies, share or give control thereof to any insurer with respect to such Indemnification Claim. If the Indemnifying Party does not elect to assume the defense of a Third Party Claim or to accept liability for an Indemnification Claim as provided above within 90 days after receipt of an Indemnification Notice, then notwithstanding the provisions of Section 9.9 the Indemnifying Party shall have the right to submit the question of whether the Indemnifying Party is liable for the Third Party Claim and/or the Indemnification Claim to a single arbitrator designated in accordance with the rules then in effect of the American Arbitration Association in New York, New York, whose determination (the "Arbitral Award") shall be final and binding.

7.5    Offset. The Buyer may offset any and all amounts due to the Buyer under this Article VII or any other provision of this Agreement, against amounts that may be due to the Seller or MH under any other agreement or arrangement, including but not limited to the Manufacturing Agreement, any other Transaction Document, or the Promissory Note referenced in Section 3.3(e), provided that the amounts due hereunder has either been (i) agreed upon by a Selling Party and the Buyer, or (ii) fixed by an Arbitral Award.

7.6    Indemnification Limitations; Exclusivity

(a)    Notwithstanding anything to the contrary contained in this Agreement, no amount of indemnity shall be payable as a result of any claim in respect of any damage or loss arising under Section 7.2:

(i)    Unless, until and then only to the extent that the Indemnified Parties thereunder have suffered, incurred, sustained or become subject to damages referred to in Section 7.2 in excess of $100,000 in the aggregate, provided that after damages exceed $100,000 all damages incurred (including but not limited to the first $100,000) shall be recoverable;

(ii)    For any damages referred to in Section 7.2 in excess of $2,000,000;

(iii)    For any damages resulting from failure to obtain consents that may be required to the assignment of the Licenses listed on Schedule 4.4(b) hereto if and to the extent that such consents have not been obtained prior to Closing and Buyer waived receipt of such consents as a condition to Closing pursuant to Section 3.4(f) hereof.

provided, that any Indemnification Claim under Section 7.2(c) shall not be subject to the foregoing limitations.

(b)    After the Closing, to the fullest extent permitted by law, the indemnities set forth in this Article VII shall be the exclusive remedies of Buyer and the Selling Parties and the indemnified parties for any misrepresentation, breach of warranty or nonfulfillment or failure to be performed of any covenant or agreement contained in this Agreement, and the parties shall not be entitled to a

rescission of this Agreement or to any further indemnification rights or claims of any nature whatsoever in respect thereof, all of which the parties hereto hereby waive for themselves and the other indemnified parties.

## ARTICLE VIII - TERMINATION

8.1     Termination Events.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     by either Buyer or Seller if a material breach of any provision of this Agreement has been committed by the other party and such breach has not been waived or cured within twenty (20) days after written notice thereof;

(b)     by Buyer if any of the conditions in Section 3.4 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date;

(c)     by Seller, if any of the conditions in Section 3.5 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date;

(d)     by mutual consent of Buyer and the Selling Parties; or

(e)     by either Buyer or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before January 31, 2007, or such later date as the parties may agree upon.

8.2     Effect of Termination.  Each party's right of termination under Section 8.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to Section 8.1 all further obligations of the parties under this Agreement will terminate; provided, however, that if this Agreement is terminated by a party because of the breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE IX - MISCELLANEOUS

9.1     Waiver; Amendment.  Each Party may, at its option, waive in writing any and all of the obligations herein contained to which any other Party is subject.  The failure of any Party at any time to require performance by any other Party of any provision hereof shall in no way affect such Party's full right to require such performance at any time thereafter.  Nor shall the waiver by any Party of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.  This Agreement may be amended or modified only by

an instrument in writing executed by all Parties.

9.2    Counterparts; Attachments.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All exhibits and schedules attached hereto and all other documents referred to herein and delivered pursuant to and in accordance with this Agreement are deemed to be an integral part of this Agreement.

9.3    Severability.  If any provision of this Agreement shall be determined to be contrary to law or unenforceable, the remaining provisions shall be severable and enforceable in accordance with their terms.

9.4    Headings.  The article, section and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.5    Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns, provided that any assignment of this Agreement or the rights hereunder by any Party hereto without the prior written consent of all other Parties.

9.6    Third-Party Beneficiary.  This Agreement is solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and no other Party has any right, benefit, priority or interest under, or because of the existence of, this Agreement.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Parties hereto any rights, liabilities, or remedies under or by reason of this Agreement.

9.7    Arms Length Contract.  This Agreement has been negotiated "at arms length" by the Parties, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof.  Accordingly, in construing the provisions of this Agreement no Party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

9.8    Notices.  All notices, requests, demands and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly delivered: (i) on the date of delivery if by personal delivery; (ii) on the date of transmission with confirmed receipt by telephone if delivered by telecopier; or (iii) on the date on which return receipt is signed or delivery is refused if dispatched by certified or registered first class mail, Federal Express or similar service, postage prepaid, return receipt requested, to the Party to whom the same is so given or made, and any Party may change its address for receiving notice by written notice given to the others named above.  Notice shall be given as follows:

If to the Seller or MH or Great Champion

      Mainland Headwear Holdings Limited
      Room 1001-1005, 10/F.
      Tower 2, Enterprise Square
      No. 9 Sheung Yuet Road
      Kowloon Bay, Kowloon

Hong Kong
Attention: Ms. Pauline Ngan/Mr. Peter Ho
Fax No.: (852) 2796-1517

With a copy to:

Troutman Sanders Solicitors
Suite 3403
Two Exchange Square
8 Connaught Place
Hong Kong
Attention: Shirley Lau, Esq.
Fax: (852) 2533-7898

If to the Buyer:

Drew Pearson Marketing, LLC
362 Fifth Avenue
2nd Floor
New York, New York 10001
Fax: (212) 868-25295

With a copy to:

Steven M. Gerber
666 Fifth Avenue
New York, New York 10105
Fax No. (212) 245-2255

9.9  Governing Law; Jurisdiction.  This Agreement is to be governed by and construed according to the laws of the State of New York and the United States of America.  All disputes hereunder, except for arbitration proceedings initiated pursuant to Section 7.4(b), shall be submitted to the exclusive jurisdiction of the State and Federal courts located within New York, New York.

9.10  Entire Agreement.  This Agreement and the exhibits, schedules, and attachments hereto contain the entire understanding by and among the Parties and supersede all other agreements and understandings, whether oral or written, by and among the Parties and their respective officers, directors, or employees with respect to the transactions contemplated hereby.

9.11  Disclosure Schedules.  For a period commencing on the date hereof, through the date that is 20 days after the Closing,, the Company shall have the right to amend Schedules 4.10, 4.11, 4.13 and 4.15, such amendments to be subject to Buyer's prior written consent (which shall not be unreasonably withheld or delayed), in order to properly reflect the Assets and Liabilities being transferred to Buyer.

[SIGNATURE PAGE TO FOLLOW]

31

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals, all as of the date first above written.

GREAT CHAMPION INTERNATIONAL CO., LTD.

Signature: _____
    Name:  YUEN YUK CHUN
    Title:   DIRECTOR

MAINLAND HEADWEAR HOLDINGS LTD.

Signature: _____
    Name:  NGAN HEI KEUNG
    Title:   CHAIRMAN

DREW PEARSON MARKETING, INC.

Signature: _____
    Name:  NGAN HEI KEUNG
    Title:   DIRECTOR

DREW PEARSON MARKETING, LLC

Signature: _____
    Name:  SAM HAFIF
    Title:   PRESIDENT & CEO

CO hereby guarantees to the Company and MH the full and timely performance of the Buyer's obligations hereunder.

U.S.P.A ACCESSORIES, LLC D/B/A/ CONCEPT ONE

Signature: _____
Name:  SAM HAFIF
Title:   PRESIDENT & CEO

32

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals, all as of the date first above written.

**GREAT CHAMPION INTERNATIONAL CO., LTD.**

Signature: _____
    Name:
    Title:

**MAINLAND HEADWEAR HOLDINGS LTD.**

Signature: _____
    Name:
    Title:

**DREW PEARSON MARKETING, INC.**

Signature: _____
    Name:
    Title:

**DREW PEARSON MARKETING, LLC**

Signature: _____
    Name:   SAM HAFIF
    Title:   PRESIDENT & CEO

CO hereby guarantees to the Company and MH the full and timely performance of the Buyer's obligations hereunder.

**U.S.P.A ACCESSORIES, LLC D/B/A/ CONCEPT ONE**

Signature: _____
Name:    SAM HAFIF
Title:    PRESIDENT & CEO

33

# GUARANTY

This Guaranty, dated as of December 11, 2006, is made by U.S.P.A. ACCESSORIES, LLC d/b/a CONCEPT ONE, a New York limited liability company (the "Guarantor"), for the benefit of DREW PEARSON MARKETING, INC., a Minnesota corporation (the "Seller") and MAINLAND HEADWEAR HOLDINGS, LTD., a Bermuda company (the "Parent", and together with the Seller, the "Companies").

WHEREAS, pursuant to the terms of that certain Asset Purchase Agreement dated the date hereof by and among Drew Pearson Marketing, LLC (the "Buyer"), the Parent, Great Champion International Co., LTD. ("Great Champion"), the Seller, and the Guarantor (the "Asset Purchase Agreement"), the Seller is selling to the Buyer and the Buyer is purchasing from the Seller all of the Seller's assets, except for certain excluded tax assets described in the Asset Purchase Agreement, and the Buyer is assuming all of the Seller's liabilities, except for certain excluded tax liabilities described in the Asset Purchase Agreement;

WHEREAS, the Parent owns 100% of the stock of Great Champion and Great Champion owns 100% of the stock of the Seller;

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, the Buyer has executed a Promissory Note dated the date hereof in favor of the Parent in the amount of $_____ (the "Note"), which Note evidences certain trade debt owed to the Parent and its subsidiaries by the Seller, which such trade debt is being assumed by the Buyer pursuant to the Asset Purchase Agreement;

WHEREAS, the Guarantor is an affiliate of the Buyer and will obtain substantial direct and indirect benefits by reason of the consummation of the transactions contemplated by the Asset Purchase Agreement; and

WHEREAS, as a condition precedent to the effectiveness of the Asset Purchase Agreement, the Companies have requested that the Guarantor execute and deliver this Guaranty to and for the benefit of the Companies.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including, without limitation, the benefits to accrue to the Guarantor by reason of Companies entering into the Asset Purchase Agreement, and to further induce the Companies to enter into the Asset Purchase Agreement, the Guarantor hereby agrees as follows:

1.    Guaranteed Obligations. The Guarantor hereby absolutely and unconditionally guarantees to the Companies the full, prompt and complete performance and payment when due, whether at maturity or earlier by reason of acceleration or otherwise, whether now existing or hereafter arising, of: (a) all of the terms, covenants, conditions, indebtedness, liabilities and obligations of the Buyer under the Note, the Asset Purchase Agreement and all documents, instruments and agreements executed in connection therewith and related to the transactions contemplated therein, including, without limitation, the Manufacturing Agreement and the

Option Agreement (each, as defined in the Asset Purchase Agreement), and (b) each and every other sum and other liability and obligation of the Buyer now or hereafter owing or due to the Companies by the Buyer, whether absolute or contingent, direct or indirect, primary or secondary, sole, joint, several or joint and several, secured or unsecured, due or not due, contractual, tortious or statutory, liquidated or unliquidated, arising by agreement or imposed by law or otherwise (all of such indebtedness, liabilities and obligations described herein being hereinafter called the "Guaranteed Obligations").

2.    Unconditional Nature. No act or thing need occur to establish the Guarantor's liability hereunder, and no act or thing, except full performance, payment and discharge in full of all of the Guaranteed Obligations, shall in any way exonerate the Guarantor hereunder or modify, reduce, limit or release the Guarantor's liability hereunder. This is an absolute, unconditional and continuing guaranty of payment and performance of the Guaranteed Obligations and shall continue to be in force and be binding upon the Guarantor, whether or not all of the Guaranteed Obligations are paid and satisfied in full, until this Guaranty is indefeasibly paid and satisfied in full and the Companies have furnished Guarantor with written notice confirming the same.

3.    Insolvency of or Lawsuit Against the Guarantor. If the Guarantor shall be or become insolvent (however defined), then the Companies shall have the right to declare immediately due and payable, and the Guarantor will forthwith pay to the Companies, the full amount of all of the Guaranteed Obligations whether due and payable or unmatured. If the Guarantor voluntarily commences or there is commenced involuntarily against the Guarantor a case under the United States Bankruptcy Code, the full amount of all of the Guaranteed Obligations, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof. If any suit or proceeding shall be filed against the Guarantor or the Buyer that, if adversely determined, could substantially impair the ability of the Guarantor or the Buyer to perform any of the Guaranteed Obligations, as determined by the Companies in their sole and absolute discretion, the full amount of all of the Guaranteed Obligations, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof.

4.    Subrogation, etc. The Guarantor hereby waives all rights that the Guarantor may now have or hereafter acquire, whether by subrogation, contribution, reimbursement, recourse, exoneration, contract or otherwise, to recover from the Buyer or from any property of the Buyer any sums paid under this Guaranty. The Guarantor will not exercise or enforce any right of contribution to recover any such sums from any person who is a co-obligor with the Buyer or a guarantor or surety of the Guaranteed Obligations or from any property of any such person until all of the Guaranteed Obligations shall have indefeasibly been fully paid and discharged.

5.    Enforcement Expenses. The Guarantor will pay or reimburse the Companies for all reasonable costs, expenses and attorneys' fees paid or incurred by the Companies in endeavoring to collect and enforce the Guaranteed Obligations and in enforcing this Guaranty.

6.    Companies's Rights. The Companies shall not be obligated by reason of their acceptance of this Guaranty to engage in any transactions with or for the Buyer. Whether or not any existing relationship between the Guarantor and the Buyer has been changed or ended and whether or not this Guaranty has been revoked, the Companies may enter into transactions resulting in the creation or continuance of the Guaranteed Obligations and may otherwise agree,

2

consent to or suffer the creation or continuance of any of the Guaranteed Obligations, without any consent or approval by the Guarantor and without any prior or subsequent notice to the Guarantor. The Guarantor's liability shall not be affected or impaired by any of the following acts or things (which the Companies are expressly authorized to do, omit or suffer from time to time, both before and after revocation of this Guaranty, without consent or approval by or notice to the Guarantor): (a) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all of the Guaranteed Obligations; (b) one or more extensions or renewals of the Guaranteed Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities, if any, or other contractual terms applicable to any of the Guaranteed Obligations or any amendment or modification of any of the terms or provisions of the Asset Purchase Agreement, the Note or any note, security agreement, letter agreement or other agreement under which the Guaranteed Obligations or any part thereof arose; (c) any waiver or indulgence granted to the Buyer, any delay or lack of diligence in the enforcement of the Guaranteed Obligations or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any of the Guaranteed Obligations; (d) any full or partial release of, compromise or settlement with, or agreement not to sue, the Buyer or any guarantor or other person liable in respect of any of the Guaranteed Obligations; (e) any release, surrender, cancellation or other discharge of any evidence of the Guaranteed Obligations or the acceptance of any instrument in renewal or substitution therefor; (f) any failure to obtain collateral security (including rights of setoff) for the Guaranteed Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security; or any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any collateral security; (g) any collection, sale, lease or disposition of, or any other foreclosure or enforcement of or realization on, any collateral security; (h) any assignment, pledge or other transfer of any of the Guaranteed Obligations or any evidence thereof; (i) any manner, order or method of application of any payments or credits upon the Guaranteed Obligations; and (j) any election by the Companies under Section 1111(b) of the United States Bankruptcy Code. The Guarantor waives any and all defenses and discharges available to a surety, guarantor or accommodation co-obligor.

7.    <u>Waivers by Guarantor</u>. The Guarantor waives any and all defenses, claims, setoffs and discharges of the Buyer, or any other obligor, pertaining to the Guaranteed Obligations, except the defense of discharge by indefeasible payment in full. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against the Companies any defense of waiver, release, discharge or disallowance in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability that may be available to the Buyer or any other person liable in respect of any of the Guaranteed Obligations, or any setoff available against the Companies to the Buyer or any other such person, whether or not on account of a related transaction. The Guarantor expressly agrees that the Guarantor shall be and remain liable for any deficiency remaining after foreclosure of any mortgage or security interest securing the Guaranteed Obligations, whether or not the liability of the Buyer or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The liability of the Guarantor shall not be affected or impaired by any voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially

3

all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar event or proceeding affecting, the Buyer or any of its assets. The Guarantor will not assert, plead or enforce against the Companies any claim, defense or setoff available to the Guarantor against the Buyer. The Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment and protest of any instrument evidencing the Guaranteed Obligations. The Companies shall not be required first to resort for payment of the Guaranteed Obligations to the Buyer or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Guaranteed Obligations, before enforcing this Guaranty.

8.      <u>If Payments Set Aside, etc</u>. If any payment applied by the Companies to the Guaranteed Obligations is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Buyer or any other obligor), the Guaranteed Obligations to which such payment was applied shall for the purpose of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such Guaranteed Obligations as fully as if such application had never been made.

9.      <u>Additional Obligation of Guarantor</u>. The Guarantor's liability under this Guaranty is in addition to and shall be cumulative with all other liabilities of the Guarantor to the Companies as guarantor, surety, endorser, accommodation co-obligor or otherwise of any of the Guaranteed Obligations or obligation of the Buyer, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

10.     <u>No Duties Owed by Companies</u>. The Guarantor acknowledges and agrees that the Companies: (a) have not made any representations or warranties with respect to, (b) do not assume any responsibility to the Guarantor for, and (c) have no duty to provide information to the Guarantor regarding, the enforceability of any of the Guaranteed Obligations or the financial condition of the Buyer or any other guarantor. The Guarantor has independently determined the creditworthiness of the Buyer and the enforceability of the Guaranteed Obligations and until the Guaranteed Obligations are paid in full will independently and without reliance on the Companies continue to make such determinations.

11.     <u>Miscellaneous</u>. This Guaranty: (a) shall be effective upon delivery to the Companies, without further act, condition or acceptance by the Companies, (b) shall be binding upon the Guarantor and the successors and assigns of the Guarantor, and (c) shall inure to the benefit of the Companies and their successors and assigns; provided, however, that the Guarantor shall not be entitled to assign this Guaranty, or assign or delegate any rights or obligations under this Guaranty, without the prior written consent of the Companies and any purported assignment in the absence of such consent shall be void; provided, further, however, that the Guarantor shall have the right to assign its rights hereunder and delegate its obligations hereunder to any purchaser of and successor to the Guarantor's business, provided that any such purchaser agrees in writing to assume all obligations hereunder.  Any invalidity or unenforceability of any provision or application of this Guaranty shall not affect other lawful provisions and application thereof, and to this end the provisions of this Guaranty are declared to be severable.  The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided

4

by law. All notices, demand and other communications hereunder shall be in writing and delivered by hand or by nationally recognized overnight courier, such as Federal Express, and shall be addressed, if to the Guarantor, at the address set forth below, and if to the Companies, at the address set forth in the Asset Purchase Agreement. This Guaranty comprises the complete and integrated agreement of the Guarantor and the Companies with respect to the subject matter hereof and supersedes all prior agreements, written or oral on the subject matter hereof. This Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Guarantor and the Companies. Use of the singular shall include the plural, as the context shall provide. This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New York. Guarantor irrevocably consents that any legal action or proceeding against it under, arising out of or in any manner relating to this Guaranty or the Note, may be brought in any court of the State of New York located in New York County, New York or in the United States District Court for the Southern District of New York. Guarantor, by the execution and delivery of this Guaranty, expressly and irrevocably assents and submits to the personal jurisdiction of any of such courts in any such action or proceeding, and further irrevocably consents to the service of any complaint, summons, notice or other process relating to such action or proceeding by delivery thereof to it by hand or by mail in the manner provided for in this Guaranty. Guarantor hereby expressly and irrevocably waives any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue or <u>forum non conveniens</u> or any similar basis. Guarantor shall not be entitled in any such action or proceeding to assert any defense given or allowed under the laws of any state other than the State of New York unless such defense is also given or allowed by the laws of the State of New York. Nothing in this Guaranty shall affect or impair in any manner or to any extent the right of the Companies to commence legal proceedings or otherwise proceed against Guarantor in any jurisdiction or to serve process in any manner permitted by law.

     12.   <u>Waiver of Jury Trial</u>. **THE GUARANTOR HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF, BASED ON OR PERTAINING TO THIS GUARANTY.**

NEWYORK01 1157525v3 017758-000002 12/20/2006

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantor the date first written above.

U.S.P.A. ACCESSORIES, LLC
d/b/a CONCEPT ONE

By: _____
Name: _Sun Hafif_
Title: _CEO_

Address: _____
_____
_____

STATE OF _NY_    )
                 )
COUNTY OF _NY_   )

The foregoing instrument was acknowledged before me this _29th_ day of December, 2006 by _Sam Hafif_, the person who executed the foregoing instrument.

_____
Notary Public

```
DIANE L. MILES
NOTARY PUBLIC STATE OF NEW YORK
NO. 01MI6124394
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES MARCH 28, 2009
```

# EXHIBIT 2

-----Original Message-----
寄件者: Todd Johnson
收件者: 'Peter Ho' (E-mail) ; 'Pauline Ngan' (E-mail) ; Emily Choi (Mainland) (E-mail)
傳送日期: 2007年9月15日 上午 06:03
主旨: FW: Mainland Update

Pauline,

We got his letter from FLA today.  This is great news and a well written letter.  Thanks for working so hard on this for us.

J

-----Original Message-----
From: Auret van Heerden [mailto:avanheerden@fairlabor.org]
Sent: Friday, September 14, 2007 5:46 AM
To: Todd Johnson; Jay Powell; alevinson@paramountapparel.com; Scott Tubbs; Dave Reid; vivienner@asicsamerica.com; Miller, Angela; Spring
Patterson; Kelsey Keene; sam@concept1.com; ksperling@concept1.com; kay@headsweats.com; GaryJ@asicsamerica.com; wbell@rei.com;
on@mergeleft.com
Cc: Jorge Perez-Lopez; Roopa Nair; Heeral Coleman; Heewon BRINDLE-KHYM; Alex Wohl; Youli Gc; Sabrina Bosson; Christine Briscoe
Subject: Mainland Update

Dear All

Please find below a brief update on the latest developments at Mainland Headwear -

·    The Co-Founder/Vice Chair Pauline Ngan, Peter Ho and Linda Oei ( Director of Corporate Communication) met with international and local
representatives of the Play Fair Campaign in Hong Kong on Thursday September 13. The meeting was cordial and constructive. The NGOs agreed that
there had been no allegations of child labor at Mainland and offered their help in clarifying that for the public or buyers who may have gotten the wrong
impression from some of the generalizations in the media. Peter also pointed out for the campaign groups that Mainland does have a union and that
workers are represented. Both sides agreed that it was important to provide effective channels for workers grievances and Mainland will use the FLA'
assessment and training package on grievance procedures to improve the system they have. The FLA will also make its Hours of Work package
vailable to Mainland in the weeks to come. Given the importance of transparency in such cases contacts with the campaign groups will continue in
uture on issues of training and verification.

·    The use of the FLA packages will not only enable Mainland to complete a thorough self-assessment of their systems but also provide a baseline
from which progress can be measured. The key performance indicators can then be used by management, buyers and other stakeholders to gauge
progress.

·    Peter and I are trying to arrange to meet on October 26 in Hong Kong.

·    In the meantime, the remedial strategies already in place are showing good results. The new incentive scheme has raised piece rate wages by 13%
and the overtime hours were reduced to 50 hours in August. The fire extinguisher issue raised by auditors recently has also been rectified.

·    BOCOG have accepted the steps taken to resolve the situation at Mainland and have restored their full production rights.


On the international side I would like to remind you all to send me the names of the retailers or final customers for the caps produced at Mainland so
that I can write to them and propose a single verification audit or impact assessment at the end of the capacity building program. If you have already
made contact with your final customers please let me know how they have reacted to that proposal.


Best regards

Auret


Auret van Heerden

President and CEO

Fair Labor Association

www.fairlabor.org